UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

UNITED STATE OF AMERICA                 )
                                        )
v.                                      )          Criminal No. 04-CR-10314-RCL
                                        )
MANUEL PINALES                          )
_____

DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

The defendant challenges the nexus requirement in the search warrant

issued for his residence located at 1828 River Street, Hyde Park, MA. The

defendant concedes that probable cause to believe that he was guilty of a

crime was established within the four corners of the affidavit submitted in

support of the search warrant, however, probable cause to believe that a

person is guilty of a crime does not necessarily constitute probable cause to

search that person's residence. As the Court stated in United States v. Feliz,

182 F.3d 82, 86 (1st Cir. 1999):

     A warrant must demonstrate probable cause to believe

that (1) a crime has been committed – the 'commission' element

and (2) enumerated evidence of the offense will be found at the

place to be searched – the so-called 'nexus' element. See United

States v. Zayas-Diaz, 95 F.3d 105, 111 (1st Cir. 1996). With

regard to the 'nexus' element, the task of a magistrate in

determining whether probable cause exists is to make a

practical common-sense decision whether, given all the

circumstances set forth in the affidavit before [her]…there is a
fair probability that contraband or evidence of a crime will be
found in a particular place." <u>Illinois v. Gates</u>, 462 U.S. 213, 238
(1983)…

The inquiry for this Court is "whether the magistrate had a substantial basis
for concluding that probable cause existed" with regard to a nexus between
the criminal activity alleged and the defendant's residence.  182 F.3d at 86.
And, while the nexus between the objects to be seized and the premises to be
searched need not rest on direct evidence or observation but rather "can be
inferred from the type of crime, the nature of the items sought, the extent of
an opportunity for concealment and normal inferences as to where a criminal
would hide [evidence of a crime]…" <u>Id</u>. at 88, citing <u>United States v. Charest</u>,
602 F.2nd 1015, 1017 (1st Cir. 1978), the <u>Feliz</u> Court stated that "we do not
suggest that, in all criminal cases, there will automatically be probable cause
to search a suspect's residence.  All factors must be weighed in each case in
order to assess the reasonableness of inferring that evidence of the crime can
be found at the suspect's home.  182 F.3d at 88.

A careful analysis of the material provided in the search warrant
application demonstrates that in so far as the defendant's residence is
concerned, the application is "precisely the sort of bare bones, conclusory
document which the Fourth Amendment will not permit."  Cf.  <u>United States
v. Leon</u>, 468 U.S. 897, 919 (1984).  There is simply no specific information in

the application to tie the defendant's residence to the illegal activity being investigated, other than that the defendant lived at these premises.

Joseph Gallarelli, the affiant is a Boston Police Detective, assigned to the DEA Task Force 2 in Boston. The first paragraph of the affidavit notes that the affiant's primary duty as a task force member is the investigation of organized narcotics traffickers. Paragraphs 2 through 5 list the affiant's experience as a police officer and detective over a 14 year period , his special training and expertise in narcotics investigation. Paragraph 6 identifies the target locations of the warrants being sought:

(a)     The residence located at 7 Knight Street, Apartment 2R, in Hyde Park, MA, where Richard Pena resides (Target Location 1)

(b)     The residence located at 115 Navarre Street, Second Floor in Hyde Park, where Luis Clas resides (Target Location 2);

(c)     The business known as the Park Avenue Market, located at 631 Hyde Park Avenue, which is owned and operated by Manuel Pinales (Target Location 3); and

(d)     The residence located at 1828 River Street in Hyde Park, where Manuel Pinales resides (Target Location 4).

(The same affidavit is used to support the issuance of search warrants as to each of the 4 target locations.) Paragraph 7 details the affiant's familiarity with the instant investigation since March, 2004 and the sources of the

affiant's information (reports from other officers, meetings with a confidential source, review of transcripts of consensually recorded conversations and wire interceptions and the affiant's personal participation in the investigation. Paragraph 8 states that the affiant has other information which it chose not include in support of the warrant application.

Paragraph 9 informs that the instant investigation originated in March, 2004 utilizing information from a confidential source, consensual recordings, physical surveillance and court authorized interception of wire communications over 6 cellular phones used by members of a targeted narcotics trafficking organization – Manuel Pinales, Antonio Cruz a/k/a Eduardo, Richard Pena and Luis Clas a/k/a Cuba.

Paragraph 10 states that this organization has been distributing kilogram quantities of cocaine since June, 2004. Manuel Pinales who lives at 1828 River Street, Hyde Park, MA and who operates the Park Avenue Market, located at 631 Hyde Park Avenue is identified as the leader of the organization which is alleged to receive quantities of more than 20 kilograms at a time, the last delivery received on August 28, 2004 believed to be 80 kilograms. The organization distributes cocaine in Boston, New Bedford and Lowell, MA as well as to areas of Rhode Island and Connecticut. Clas a/k/a Cuba, Cruz and Pena work for Pinales in delivering cocaine and collecting money. The cocaine supplier is Oscar who resides in the Dominican Republic. Pablo, who lives in New York City works for Oscar by delivering cocaine to the organization on credit and then collecting money from the

organization on a weekly basis. Pinales and his organization are alleged to work with their customers by delivering kilogram quantities of cocaine on credit and then collecting money from the customers.

With regard to a supply of cocaine delivered to the organization on July 11, 2004 and stored at 7 Knight Street (Target Location 1), Paragraph 11 details that as a result of telephone calls intercepted between Eduardo and Pablo and Eduardo and Pena, law enforcement agents observed Eduardo and Pena carry a suitcase into 7 Knight Street. Intercepted cellular telephone calls revealed the following based on the opinion of the affiant:

(a)    7/4/04: Pinales and Cuba have a discussion about Eduardo going down to New York and how Pinales is waiting for a lower price from his supplier Oscar. Cuba gives Pinales instructions on how to get the price lower.

(b)    7/10/04: Pablo indicates that he has a new delivery for Pinales and wants Pinales to speak to Oscar;

(c)    7/10/04: Pinales and Eduardo discuss Pablo's impending delivery of cocaine the price for which Pinales intends to confirm with Oscar;

(d)    7/10/4: Pablo calls Pinales three times telling Pinales to speak with Oscar;

(e)    7/10/04: Pinales and Cuba talk about the price for the impending delivery and Pinales' need to confirm the price with Oscar. A reference to Eduardo and writing down the

numbers indicates that Pinales keeps an accounting of money collected;

(f)    7/10/04:  Pinales and Eduardo discuss the need to get money to give to Pablo and the need to get Oscar to lower his price;

(g)    7/10/04:  Pinales calls Jose looking for money to pay Pablo;

(h)    7/10/04:  Pinales speaks to his customer Hipolito in an effort to collect money;

(i)    7/10/04:  Pinales informs Pablo that he has not yet reached Oscar;

(j)    7/10/04:  Pinales speaks with Emilio in an effort to collect money for Pablo and informs Emilio what the price per kilo will be;

(k)    7/10/04:  Pinales and Oscar discuss cocaine;

(l)    7/10/04:  Pinales and Oscar agree on a price of $22,000 per kilogram and Oscar informs Pinales that he has a supply of 600 kilograms.  The call reveals that Oscar imports cocaine into the United States;

(m)    7/10/04:  Pinales informs Eduardo to be ready for a delivery in the morning at $22,000 per kilogram;

(n)    7/11/04:  Eduardo tells Pena to go to Fall River to pick up money and to be prepared to switch vehicles;

20

(o)    7/11/04:  Pinales and Eduardo discuss the delivery of

cocaine which Eduardo is supposed to pick up;

(p)    7/11/04:  Pinales tells Pablo that Eduardo will be taking

the delivery of cocaine;

Paragraph 12 describes how agents following Eduardo, who is in Pena's

vehicle, lose him in traffic.  A phone call between Eduardo and Pena is then

intercepted in which Eduardo tells Pena to meet him at the house.

Paragraph 13 describes agents' observations of Eduardo and Pena carrying a

large suitcase from the vehicle Eduardo had been driving when, on his way to

meet Pablo, he eluded the agents, into 7 Knight Street (Target Location 1).

Thereafter, the following cellular telephone calls were intercepted:

(a)    7/11/04:  Eduardo tells Pinales that he and Pena have the

cocaine which Eduardo received from Pablo;

(b)    7/11/04:  Pinales calls Hipolito to tell him that he can

have cocaine the next day at $24,000 per kilogram;

(c)    7/11/04:  Pinales instructs Eduardo on how to cut the

cocaine; and

(d)    7/11/04:  Pinales and Eduardo discuss the processing of

the cocaine.

Paragraph 14 describes how the organization then distributes the

cocaine to customers.  Paragraph 15 describes the eventual sale of cocaine to

Emilio on 7/15/04 through the following intercepted cellular telephone calls:

(a)    7/11/04:  Emilio orders 2 kilograms from Pena;

(b)    7/11/04:  Emilio attempts to order 4 kilograms of cocaine;

(c)    7/11/04:  Emilio and Pinales bargain over the price per

       kilogram;

(d)    7/11/04:  Pinales tells Pena not to deal with Emilio;

(e)    7/15/04:  Pinales explains to Emilio that he cannot lower

       the price because the profit is split among four people.

       Emilio orders one kilogram; and

(f)    7/15/04:  Pena confirms with Emilio that he is receiving

       one kilogram.

Paragraph 16 describes a cocaine sale to Jose on 7/15/04 through the

following intercepted cellular telephone call:

(a)    7/15/04:  Jose orders one good quality kilogram from

       Pena; and

(b)    7/15/04:  Jose complains to Pena about the quality of the

       cocaine;

Paragraph 17 describes a sale of five kilograms of cocaine to Prieto on

7/17/05 through the following intercepted telephone calls:

(a)    7/17/04:  Eduardo informs Pinales that he will be selling 5

       kilograms to Prieto at $24,000 each; and,

(b)    7/17/04:  Eduardo tells Pena to deliver the cocaine to

       Prieto;

Paragraph 17 then describes the distribution of cocaine to Tajh White on

divers dates through the following cellular telephone calls:

(a)     7/11/04:  Pinales tells Eduardo to deliver cocaine to "T" as
        Cuba had instructed;

(b)     7/11/04:  Pinales informs Eduardo that Cuba told "T" that
        the price would be $24,250.  Eduardo informs Pinales that
        Prieto only paid "19".  Eduardo also informs Pinales that
        the cocaine is not of great quality.

(c)     7/12/04:  Eduardo tells Pena to deliver five kilograms to
        "T" in Fall River;

(d)     7/12/04:  Pinales tells Eduardo that the price per kilogram
        for Boris is $24,500 and that the customer from Fall River
        is to pay $24,250, the price quoted by Cuba;

(e)     7/23/04:  Eduardo and Pena discuss the fact that the 5
        kilograms of cocaine do not fit into the small car brought
        by the Fall River customer;

(f)     7/24/04:  Pena and Eduaro discuss a quantity of cocaine in
        relation to the Fall River customers;

(g)     8/5/04:  Eduardo and Tajh White discuss the distribution
        of cocaine;

(h)     8/12/04:  Eduardo and Tajh White schedule a meeting for
        the delivery of cocaine to White;

(i)     8/12/04:  Eduardo and Tajh White discuss the cocaine to
        be delivered to White;

(j)     8/12/04:  Eduardo and Tajh White discuss the delivery of

cocaine; and;

(k)     8/13/04: Eduardo confirms with Tajh White that White

paid $33,000 for the cocaine he had previously received.

Paragraphs 18-21 describe a cocaine delivery on August 20, 2004.  In

Paragraph 18, the affiant describes information he received  on August 17,

2004 concerning a cocaine delivery from Pablo.  On August 18, 2004 the

affiant learns that someone has backed out of a deal and that Oscar has

cocaine available to Pinales at a price of $21,500 per kilogram.  In Paragraph

19 the affiant recounts the viewing of a video surveillance camera placed

outside of 7 Knight Street (Target Location1).  The video reveals that on

August 28, 2004, Pena removed two large suitcases from a Ford Explorer and

carried them into 7 Knight Street.  In Paragraphs 21 and 22 the affiant

recounts how pen register information on August 28, 2004 between various

cell phones used by Pinales, Pablo and Pena also leads him to believe that the

bags carried into 7 Knight Street on August 28, 2004 contained cocaine.

In Paragraphs 22-25, the affiant discusses the storing of cocaine at 115

Navarre Street (Target Location 2).  On September 12, 2004, by means of a

surveillance camera, agents observed a Hispanic male carry a suit case into 7

Knight Street.  Thereafter, agents observed a Hispanic male exit 7 Knight

Street with a suitcase which was then loaded into Pena's Ford Explorer.  The

Explorer was driven to 115 Navarre Street where the suitcase was pulled up

the stairs and into 115 Navarre Street.   Paragraph 23 describes the moving

of furniture from 107 Durnell Avenue, Roslindale, MA (where Pena and Eduardo were previously believed to reside) to 115 Navarre Street, Hyde Park, MA.  Paragraph 24 recounts agents' view of Cuba coming and going at 115 Navarre Street between September 14, 2004 and October 8, 2004.  In Paragraph 25, the affiant opines that Cuba had transferred a portion of the cocaine supply from 7 Knight Street to 115 Navarre Street in order to facilitate distribution.

In Paragraph 26-27, the affiant describes a meeting between Pinales and a longtime cooperating source (CS) on September 21, 2004 at the Park Avenue Market (Target Location 3) in which Pinales says that he had "a job there", meaning cocaine.  Pinales tells CS that he has 80 kilograms of cocaine and asks CS to help by checking with CS's customers.  In Paragraph 27, the affiant opines that as of September 21, 2004, Pinales still has 77 kilograms, and that as of October 8, 2004, Pinales has in excess of 40 kilograms.

In Paragraph 28 the affiant describes an October 6, 2004 conversation between Pena and Cuba as to whether to store the cocaine and drug paraphernalia at 7 Knight Street, Apt 2R (Target Location 1) or 115 Navarre Street (Target Location 2).

Paragraph 29-31 describe the distribution of cocaine to Robinson Justiano on September 1, 2004.  On October 1, 2004, a surveillance camera reveals a man arriving at 7 Knight Street in Pena's Ford Explorer.  The man is observed to leave 7 Knight Street carrying a white plastic bag.  The man is followed to 107 Durnell Avenue.  At a certain point a Sable registered to Pena

is followed by a Volvo Wagon to 107 Durnell Avenue. Robinson Justiano and Tiffany Botello of New Bedford are in the Volvo. Eventually the Volvo is stopped by police. The Volvo was searched and a kilogram of cocaine was found. The affiant opined that the kilogram of cocaine had been picked up from 7 Knight Street on September 1, 2004.

Paragraphs 32-35 describe the distribution of cocaine to Tajh White on September 27, 2004. The affiant describes the distribution of a kilogram by Cuba to White on September 27, 2004 and how the agents followed White and found a kilogram of cocaine discarded by White in the woods after White learned that he was being followed. Cellular telephone calls between White and Cuba and Cuba and Pinales were intercepted revealing the following:

(a)    September 26, 2004: White tells Cuba he will come tomorrow;

(b)    September 29, 2004: White tells Cuba he will try to make arrangements to meet him; and

(c)    September 27, 2004: White and discuss meeting at Burger King in 45 minutes;

Paragraph 33 describes how agents observed Cuba and White meeting at a Burger King. Cuba was followed to 115 Navarre Street and then Cuba was followed as he returned to where White was waiting. Agents eventually observed Cuba placing a plastic bag in the trunk of White's vehicle. Both Cuba and White left the area in their respective vehicles. Cuba then called Pinales and informed him that White had bought a kilogram for $23,000. White's vehicle was followed by agents who eventually found a tan plastic

bag discarded in the woods by White. White then called Cuba to set up a meeting. Cuba then called Pinales and told Pinales that White had been followed and had to dump the stuff.

Paragraph 36-39 describe the distribution to Alex Hernandez on September 29, 2004. According to the affidavit, Hernandez was Hipolito's runner who met with Cuba. Based upon intercepted calls between Pinales and Hipolito, Hernandez was to deliver money and pick up cocaine. Agent's observed the meeting between Cuba and Hernandez. Hernandez's vehicle was stopped on Route 93N and a kilogram of cocaine was found in his car. Hipolito and Pinales then spoke on the cellular telephone about the arrest of Hernandez. Cuba had left the Hyde Park Market (Target Location 3) prior to meeting with Hernandez. Cuba was observed to go to 115 Navarre Street, apparently retrieve something, and then return to Hernandez' vehicle. The affiant opined that Cuba had gone to his residence at 115 Navarre Street where he resides and stores cocaine, retrieved a kilogram of cocaine and delivered it to Hernandez.

In Paragraphs 40-48, the affiant identifies the locations subject to search. Paragraphs 41 and 42 provide a physical description of Target Location 1, 7 Knight Street, Apartment 2R. In Paragraph 42, the affiant identifies Target Location 1 as Pena's residence and a place where Pena, Eduardo and Cuba have been seen coming to and going from. On July 11, 2004 Eduardo and Pena were observed to carry a suitcase believed to contain cocaine to Target Location 1. On August 28, 2004 Pena was observed to carry

2 suitcases believed to contain cocaine into Target Location 1.  A hard line telephone is assigned to Pena at Target Location 1.  Both Pena and Cuba have used this hard line to communicate with Pinales, as recently as September 26, 2004.  Paragraph 46 describes Target Location 2, an apartment located at 115 Navarre Street, Floor 2 believed to be occupied by Cuba and a place where Cuba and Pinales would meet.  Paragraph 47 describes Target Location 3, the Park Avenue Market, located at 631 Hyde Park Avenue, owned and operated by Pinales.  Pinales was often observed by agents to be inside the store and operating the business.  Pena, Eduardo and Cuba have been observed at the store.

In Paragraph 48, the affiant merely describes Target Location 4, 1828 River Street in Hyde Park, as Pinales' residence.

In Paragraph 49-53, the affiant describes the use of Target Location 1 – 7 Knight Street, Apartment 2R as a stash house and a place to process narcotics.  Referring to Paragraph 11-13, the affiant recites how this locus has been used to store and process cocaine.  Referring to Paragraphs18-20, the affiant recites how cocaine has been delivered to this locus.  Referring to Paragraphs 29-31, the affiant recites how cocaine was retrieved from this locus for delivery to Justiniano.  Referring to Paragraph 28, the affiant recites a call between Cuba and Pena revealing how they store and process cocaine in their residences.  Finally, in Paragraph 53, the affiant cites three intercepted cellular telephone calls indicating that Pena stores monetary proceeds of drug sales at this locus.

In Paragraphs 54-59, the affiant describes the use of Target Location 2 – 115 Navarre Street, Floor 2 – as a stash house and place to process narcotics.  Referring to prior paragraphs the affiant recites the fruits of surveillance conducted on September 12, 2004 which leads the affiant to opine that on that date, Cuba moved a suitcase carrying a supply of cocaine from Target Location 1 to Target Location 2 in order to facilitate distribution of the cocaine.  Referring to Paragraphs 32-35 the affiant recites how Cuba, on September 29, 2004 procured a kilogram of cocaine from Target Location 2 for delivery to Hernandez after initially meeting Hernandez outside of Target Location 3.  Referring to Paragraph 28, the affiant recited an intercepted call between Cuba and Pena in which each confirm that they store and process cocaine in their residences.  The affiant references an intercepted call between Cuba and Pinales in which Cuba indicates that he uses Target Location 2 for the storage of cash proceeds from the sales of cocaine. (According to the affiant, this very same call shows that Pinales uses the Park Avenue Market [Target Location 3] in his cocaine business.)

In Paragraphs 60-63 the affiant describes the use of Target Location 3 – The Park Avenue Market – as a point of operation for Pinales' cocaine distribution business.  The affiant recites how Cuba, Eduardo and Pena have been observed on numerous occasions coming and going from this market which is owned and operated by Pinales.  Referring to a series of intercepted cellular telephone calls on September 19, 2004, the affiant describes how Pinales uses Target Location 3 to meet with customers or their runners who

are delivering money in payment for cocaine and to store the cash proceeds of the cocaine business.[1]  Referring to a call intercepted between Pinales and Cuba on July 3, 2004, the affiant describes how Pinales uses a money transmittal service in Target Location 3 to launder money and to structure transactions using different names for the transmittals.  The affiant also describes in Paragraph 62 how Pinales keeps records regarding these transactions and records regarding the location of the proceeds of the transactions at Target Location 3.  In Paragraph 63, the affiant demonstrates how through intercepted conversations between Pinales and Cuba on July 1, 2004 and July 10, 2004,[2] Pinales kept an accounting of the debts owed to him for extending credit to his customers, as well as, an accounting of the money collected by others within the cocaine organization at the market.

    In contrast with the specific factual assertions with regard the nexus between criminal activity and Target Location 1, Target Location 2 and Target Location 3, the affiant's description of the nexus between criminal activity and Target Location 4 – Pinales' residence at 1828 River Street – is totally devoid of any factual detail.  Paragraphs 64-66 identify 1828 River Street as Pinales' residence and then recite precisely the sort of bare bones, conclusory statement which the Fourth Amendment does not permit to establish probable cause.  Previously, the affiant had demonstrated that

_____

[1] In establishing probable cause for Target Location 2, the affiant had previously recited how Target Location 3 was used to store cash proceeds of the cocaine business (Paragraphs 58-59) and how Target Location 3 was used as a meeting place for customers and their runners (Paragraph 56).

[2] Cellsite information revealed that Pinales was located in the vicinity of Target Location 3, and most likely in the market, at the time of the July 1, 2004 telephone call.

Pinales maintains records and moneys relating to the distribution at his

place of business—Target Location 3.  All the affiant can say about Target

Location 4 is that drug traffickers generally maintain records and proceeds at

their residences.  The affidavit utterly fails to demonstrate that fruits,

instrumentalities or evidence of a crime is located on these premises.

Certainly, there was no direct information connecting evidentiary items with

Target Location 4, as where it is known that criminal activity occurred at

that place, or adjacent thereto.  Nor is this a situation where it is known that

the crime occurred elsewhere but fruits of the crime were recently observed

at the locus.  There was no showing that the defendant ever attempted to

conceal the location of his residence.  No seller or buyer ever went to the

defendant's residence prior to or after an alleged transaction.  No sales ever

occurred near the defendant's residence.  In United States v. Feliz, supra, the

Court upheld a warrant to search a drug dealer's residence even though there

was no direct evidence that drug paraphernalia – such as client lists and

accounting records – were stored at the house.  The Court recognized that it

was reasonable to suppose that "a long-time, successful drug trafficker"

possessed at his home "documents showing the names and telephone

numbers of customers and suppliers as well as accounts showing the monies

paid and collected"  Id. at 87.  The Court pointed out that, in sum, the Feliz

affidavit contained substantial detailed information of the defendant dealing

drugs for 12 years and that "[n]o other residences or drug-dealing

headquarters of his was identified in the affidavit.[3]  It followed that a likely place to seek to find incriminating items would be Feliz's residence…If he did not maintain his accounts and records, and presumably large sums of money received in the course of his dealings, at his apartment, where else would he keep them?" Id. at 88.  See United States v. $149,442.43 in United States Currency, 965 F.2d 868, 874 (10th Cir. 1992) ("where a suspect has no place of business separate from his residence, it is reasonable for an officer to conclude that evidence [i.e. drug-related business records] may be at a suspect's residence.")

     As stated in infra, the law of this Circuit does not provide automatic probable cause to search a suspect's residence.  All factors must be weighed in each case in order to assess the reasonableness of inferring that evidence of the crime can be found in the suspect's home.  Viewing the material provided in the instant warrant application the magistrate did not draw a reasonable inference of probable cause as to Target Location 4.[4]  Not only did the affidavit fail to set forth any facts connecting drugs, drug paraphernalia or drug records to the defendant's residence, the factual allegations in the

---

[3] Specifically there was no indication that Feliz used his store in his drug dealing business. Here the affidavit specifically documented that the defendant did use his store, Target Location 3, in his drug business.

[4] For cases presenting analogous circumstances and finding that probable cause did *not* exist for the search of a suspect's residence, see, United States v. Rosario, 918 F.Supp. 524, 528 (D.R.I. 1996) (opinion of DEA agent based upon her knowledge of behavior and practices of narcotics dealers could not, by itself, furnish nexus between criminal activity and the place to be searched); United States v. Rios, 881 F.Supp. 772, 775 (D.Conn. 1995) (agent's expert opinion does not, standing alone, establish nexus); United States v. Gomez, 652 F.Supp 461, 463 (E.D.N.Y) (same); United States v. Kenney, 595 F.Supp. 1453, 161 (D. Me. 1984) (mere statement in affidavit that suspect had committed drug crime not enough to establish nexus to residence)

affidavit clearly providing probable cause for the issuance of search warrants for Target Location 1, Target Location 2 and Target Location 3, go a long way to negating any nexus between the defendant's residence and drug activity. Considering the investigation's length (approximately 7 months) and intensity (use of confidential sources, wiretaps, and all types of surveillance), the affiant was readily able to build a case for probable cause as to the defendant's store (Target Location 3). Yet, despite the use of a wide variety of investigative tools, over a considerable length of time, the affidavit in support of the warrant issued for Target Location 4, the defendant's residence, provides no factual corroboration for the affiant's general conclusory assertions as to probable cause for that locus. Absolutely no evidence is presented to establish a nexus between the defendant's residence and his alleged drug-dealing activity.

And, because the warrant for the defendant's residence was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," United States v. Leon, 468 U.S. 897, 932 (1984) (Quoting Brown v. Illinois, 442 U.S. 590, 610-611 (1975), suppression is still appropriate because the issuing magistrate wholly abandoned her neutral and detached role by rubber-stamping the bare-bones conclusory statements of the affiant. As to Target Location4, the magistrate merely ratified the non-factually based conclusions of a law enforcement officer, who, with the assistance of Government lawyers in drafting the affidavit, was actively engaged in the competitive enterprise of ferreting out

20

crime.  The accommodation of public and private interests that the Fourth

Amendment requires can only be accomplished by suppressing the evidence

seized from the defendant's residence.

                MANUEL PINALES
                By his attorney:


                <u>s/Steven J. Rappaport</u>
                Steven J. Rappaport
                Rappaport & Delaney
                228 Central Street
                Lowell, MA  01852
                (978) 454-8103
                BBO# 412300