AO 93 (Rev. 8/98) Search Warrant

# UNITED STATES DISTRICT COURT

**DISTRICT OF** ——— MASSACHUSETTS

**In the Matter of the Search of**
(Name, address or brief description of person or property to be searched)

## SEARCH WARRANT

1828 River Street
Hyde Park, MA

CASE NUMBER: 04 CR 10314 RCL

TO: ___Task Force Agent Joseph Gallarelli___ and any Authorized Officer of the United States

Affidavit(s) having been made before me by ___Task Force Agent Joseph Gallarelli___ who has reason to
_Affiant_

believe that ☐ on the person of or ☒ on the premises known as (name, description and/or location)

See Attachment A, attached hereto and incorporated herein,

in the _____ District of ___Massachusetts___ there is now

concealed a certain person or property, namely (describe the person or property)

those items descibed in Attachment B, attached hereto and incporporated herein

I am satisfied that the affidavit(s) and any record testimony establish probable cause to believe that the person or property
so described is now concealed on the person or premises above-described and establish grounds for the issuance of this
warrant.

YOU ARE HEREBY COMMANDED to search on or before ___10-13-2004___
_Date_

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and
making the search (in the daytime -- 6:00 A.M. to 10:00 P.M.) (at any time in the day or night as I find reasonable cause
has been established) and if the person or property be found there to seize same, leaving a copy of this warrant and
receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly
return this warrant to ___Marianne B. Bowler, United States Magistrate Judge___
_U.S. Judge or Magistrate Judge_

as required by law.

_October 8, 2004 @ 11:45 AM_                        at    Boston, Massachusetts
Date and Time Issued                                          City and State

Marianne B. Bowler
United States Magistrate Judge                        _Marianne B. Bowler, USMJ_
Name and Title of Judicial Officer                    Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

## ATTACHMENT B

1. Books, records, notes, ledgers, and any other papers or records relating to the purchase, transportation, shipment, ordering, sale, importation, manufacture, and/or distribution of controlled substances and/or records relating to the receipt, disposition, and/or laundering of proceeds from the distribution of controlled substances, such as heroin and/or cocaine, and/or records or electronic devices reflecting the identity of co-conspirators and drug customers, as well as their addresses, telephone, and pager numbers. Such documents include, but are not limited to, telephone address books, planners, receipts, state and federal income tax returns and supporting paperwork, notes, ledgers, bank records, money orders, wire transfers, cashier's checks, passbooks, certificates of deposit, bills, vehicle rental receipts, credit card receipts, hotel receipts, meal receipts, travel agency vouchers, travel schedules, shipment records, telephone bills and/or toll records and bills.

2. Cash and currency, and other items of value made or derived from trafficking in illegal substances, documents related thereto, and/or objects used to conceal said proceeds. Such items include, but are not limited to jewelry, precious metals, titles of real property, deeds, bank records, safes, safe deposit boxes and/or safe deposit box keys or any other papers concerning financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in illegal substances.

3. Documents reflecting dominion and/or control of 1828 River Street, Hyde Park, Massachusetts, including, but not limited to, canceled mail, photographs, personal telephone books, diaries, bills and statements, videotapes, keys, identification cards and documents.

4. Documents or tangible evidence reflecting dominion, ownership, and/or control by Manuel PINALES over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

5. Photographs of individuals, property, and/or illegal controlled substances.

6. Firearms, including ammunition, magazines, holsters, and any components of firearms, which are kept for the protection of said controlled substances or proceeds.

## ATTACHMENT A

Target Location 4 is the residence located at 1828 River Street in Hyde Park, Massachusetts. Target Location 4 is located within a three story yellow structure containing two units (See attached photograph). Facing the front of this building, Target Location 4 is located on the left side of the building and the front door to Target Location 4 is the door on the left.



AO 93 (Rev. 8/98) Search Warrant (Reverse)

| **RETURN** | | CASE NUMBER: 04 CR 10314 RCL |
|---|---|---|
| DATE WARRANT RECEIVED 10-8-04 | DATE AND TIME WARRANT EXECUTED 10-8-04 4:05pm | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH ESMEREY VILLAR |

INVENTORY MADE IN THE PRESENCE OF

Jose Villar / TFA Esmeroy Villar

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

3 Bags U.S currency
Comcast Bill - of Manuel Pivales
Citizens Bank Check
SS & ID card Manuel Pivales - Drivers license
Lap top computer
Legal Documents from Safe
Condo Paperwork from Safe
Mortgage Papers from Safe
Documents w/ money owed - Basement
Dominican Republic check Book
Plastic Bag of Documents from safe
Citizen Bank CD - paperwork
2 DR passports - Safe
1 Set of Keys

S/A Damian Falls
DEA
617-557-2100

**CERTIFICATION**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____
U.S. Judge or Magistrate Judge

_____
Date

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Joseph Gallarelli, a Detective with the Boston Police Department currently assigned to the United States Drug Enforcement Administration (DEA) Task Force 2 in the City of Boston as a Federal Task Force Agent (TFA) being duly sworn, state:

1.    I am a Detective with the Boston Police Department assigned to the United States Drug Enforcement Administration (DEA) as a Task Force Officer with my primary duties being the investigation of organized narcotics traffickers. Since my assignment to DEA Task Force 2, I have been involved in several investigations involving the organized domestic and international importation and distribution of kilogram amounts of cocaine and heroin. These investigations resulted in the arrest and the dismantling of various distribution, transportation, and supply groups operating in the states of Massachusetts, New York, and Florida, and in Costa Rica and Colombia.

2.    I have been a police officer for the past fourteen years and a Detective since October 1998. I entered the Boston Police Academy in November of 1989 and graduated in May of 1990. I was then assigned to Area B-2 in Roxbury where my duties included general patrol work from 1990 through 1994 when I became a member of the anti-crime unit at B-2. My duties during this period included general patrol, street level narcotics work, gang related calls, gun calls, fugitive apprehension and bank robbery calls. From March 1996 to September 1998, I was assigned the Drug Control Unit in Roxbury during which time I was involved in the investigation of narcotics distribution organizations in the City of Boston. Most of those investigations involved undercover operations as well as physical surveillance. From October 1998 to April 1999, I was assigned, as a Detective, to Area C-11 in Dorchester where my duties primarily involved

1

04690

investigating domestic violence offenses, with some general investigation work.

3.     From April 1999 to the present, I have been assigned to the Drug Enforcement Administration. My current duties include investigating domestic and international narcotics distribution and importation organizations. These investigations target traffickers and importers of large quantities of narcotics, as well as street-level dealers, and have resulted in arrests and seizures of large quantities of drugs. Since 1994 I have been involved in over five hundred drug investigations.

4.     I have received specialized training from the Drug Enforcement Administration in Basic Narcotics Investigation and undercover operations in 1996, asset forfeiture in 1999, and electronic surveillance in 2000.   Additionally, I completed a five-week Detective training course in 1998, which was conducted by the Boston Police Department.

5.     Based on my training and experience, I am familiar with the methods of operation employed by narcotics traffickers operating at the local, state, national and international levels, including those involving the importation, distribution, storage, and transportation of narcotics and the collection and laundering of money that constitutes the proceeds of narcotics-trafficking activities. I am aware that drug traffickers commonly use cellular telephones in furtherance of their drug trafficking activities and frequently change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to further prevent detection. I am familiar with the common appearance, packaging, texture and smell of narcotics.

6.     This affidavit is filed in support of the search warrants for the following residences,

2

which are more specifically described in Attachment A of each warrant:

A.    The residence located at 7 Knight Street, Apartment 2R, in Hyde Park, Massachusetts **(Target Location 1)**, where Richard PENA presently resides.

B.    The residence located at 115 Navarre Street, Second Floor, in Hyde Park, Massachusetts **(Target Location 2)**, where Luis CLAS presently resides.

C.    The business known as the Park Avenue Market, located at 631 Hyde Park Avenue in Hyde Park, Massachusetts **(Target Location 3)**, which is owned and operated by Manuel PINALES.

D.    The residence located at 1828 River Street in Hyde Park, Massachusetts **(Target Location 4)**, where Manuel PINALES presently resides.

7.    I have personally participated in this investigation since March, 2004. I am familiar with the facts and circumstances of this investigation from oral and written reports made to me by other Agents of the DEA, other federal, state and local law enforcement agencies, oral and written reports of conversations and meetings with a confidential source (CS), a review of transcripts of consensual recorded conversations and wire intercepted conversations, as well as my own personal participation in the investigation.

8.    Since this affidavit is being submitted for the limited purpose of securing search warrants for the above referenced locations, I have not set forth each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to search the above-mentioned residences and business.

3

## CURRENT INVESTIGATION

9.     This affidavit is based on an investigation which originated in approximately March

2004. This investigation utilized information from a confidential source, consensual recordings,

physical surveillance, and the court-authorized interception of wire communications. On June

29, 2004, August 4, 2004, and September 13, 2004, United States District Judge Joseph L. Tauro,

in the District of Massachusetts, authorized the interception of six cellphones being used by

members of the targeted narcotics trafficking organization, including Manuel PINALES, Jose

Antonio CRUZ a/k/a EDUARDO, Richard PENA, and Luis CLAS a/k/a CUBA. During the

course of the investigation, I learned that the targeted criminal organization was and continues to

be involved in the distribution of cocaine in Massachusetts and elsewhere. The following

information is representative of the criminal conduct of the organization, and specifically those

persons, whose residences and business we seek to search, and their use of said residences and

said business for criminal purposes.

### A.  COCAINE DISTRIBUTION CONSPIRACY

10.     This investigation revealed that the organization and its members have been distributing

kilogram quantities of cocaine since at least June 2004 and continue to distribute cocaine as of

the time of the writing of this Affidavit. Based on the intercepted conversations, surveillance and

the overall investigation, I believe the following: Manuel PINALES who lives at 1828 River

Street, Hyde Park, MA and who operates the Park Avenue Market, located at 631 Hyde Park

Avenue in Hyde Park, MA, is the leader of the target cocaine distribution organization.

PINALES receives cocaine in quantities of over 20 kilograms at a time and the last delivery

received by the PINALES organization on August 28, 2004 is believed to have been a quantity of

4

80 kilograms of cocaine. PINALES and the members of his organization distribute cocaine to the Boston, New Bedford and Lowell areas of Massachusetts, as well as to areas of Rhode Island and Connecticut. The individuals working with PINALES to deliver the cocaine to and to collect money from customers are: Luis CLAS a/k/a CUBA ("CUBA"), Jose Antonio CRUZ a/k/a EDUARDO ("EDUARDO") and Richard PENA ("PENA"). The supplier of the cocaine is an individual known as OSCAR who is located in the Dominican Republic. PABLO LNU works for OSCAR and is located in New York City. PABLO is the individual to whom EDUARDO and CUBA on behalf of the PINALES organization deliver money in payment for cocaine that they receive on credit. PABLO is also the individual who delivers the cocaine to the PINALES organization. The operation works as follows: OSCAR provides large quantities of cocaine to PINALES on credit; PINALES, CUBA, EDUARDO and PENA distribute the cocaine and then collect money from their customers; CUBA and EDUARDO then deliver money to PABLO in New York on a weekly basis in payment for the cocaine. PINALES and the members of his organization work with their customers in a similar manner: they distribute kilogram quantities of cocaine to their customers on credit and then, after their customers in turn sell the cocaine, they collect the money from such customers in payment for the cocaine.

### 1. Supply of Cocaine Delivered on July 11, 2004 and Stored at 7 Knight Street (Target Location 1)

11. Based upon the intercepted conversations, surveillance and the overall investigation, I believe that on July 11, 2004, the PINALES organization received a delivery of cocaine, supplied by OSCAR and delivered by PABLO. EDUARDO met with PABLO and picked up the cocaine. Agents lost EDUARDO during surveillance and did not observe the meeting between

5

EDUARDO and PABLO. However, both before and after the meeting, calls were intercepted evidencing the meeting and thereafter, EDUARDO told PENA to meet him at the house. Surveillance then observed two Hispanic males remove a large suitcase from the back of a Ford Explorer, registered to PENA and which EDUARDO was driving. Agents observed EDUARDO and PENA carry the suitcase into 7 Knight Street **(Target Location 1)**. Calls prior to this delivery, particularly calls with OSCAR, related to negotiation over the price of the cocaine. The following intercepted calls relate to the price negotiations and delivery of this load of cocaine:

On July 4, 2004, at approximately 3:52 p.m., an incoming call was received on TARGET CELLPHONE 1 and PINALES spoke to CUBA. CUBA asked if PINALES had spoken to "that asshole" and PINALES said "yes, he went down south today." CUBA asked PINALES if "he" said anything to him because he (CUBA) "told him the other day that 'if you guys don't do the work that needs to be done, then I'll go over there to resolve it.' . . . You guys leave a mess for me." PINALES laughed. CUBA then said that he called someone to give the money to PINALES. They then discussed when CUBA was coming up from the Dominican Republic and that CUBA should be here when PINALES goes down there. CUBA then asked "what is going to be done over there.... What does Oscar say?" and PINALES replied "I'm waiting for them to go lower. They don't want to go lower and it can't be done like that." CUBA asked if they were at twenty two eight (22,800) and PINALES answered that they were at "twenty two and a half (22,500)." When CUBA asked how much it is over there, PINALES replied "it's at twenty-three (23). It's low.... the most I can do is at twenty-two (22), the most, because one was at twenty-three and a half (23.5), twenty-four (24).... But I'm aiming for one and a half (1 ½)." Then CUBA told PINALES to tell him: "I already have some people here who are already taking care of this for me ... supplying my people. I didn't give it to you because I couldn't ... can't for that number. But we'll see each other later. And let me know if you decide to go lower on the quote." They then discussed Moreno owing 80 pesos and that they did not know how much he gave today. CUBA then said that he thought EDUARDO was using it, giving them 40 or 50 and then running over there and taking 3 or 4. PINALES told CUBA that if he was here none of this would happen and CUBA agreed and added that "he is going to be gone from there." CUBA told PINALES to tell EDUARDO the Cubano is pressuring you.
**OPINION: I believe that the beginning of the conversation refers to how EDUARDO is working and shows that EDUARDO went down to New York. I believe that the reference to "waiting for them to go lower" refers to PINALES waiting for the suppliers to go down in price on the cocaine. I also believe that the reference to "Oscar" at the beginning of this conversation shows that "Oscar" is the supplier of the cocaine. I believe the numbers then discussed are the different prices**

6

per kilogram of cocaine: "twenty two eight" refers to $22,800, "twenty three and a half" refers to $23,500 and PINALES' reference to waiting for "one and a half" refers to $21,500, which is the price PINALES wants to pay for the cocaine. In my opinion, CUBA then gives PINALES instructions on how to deal with Oscar to get the price lower by telling him that he has another supplier because the price is too high, but to let him know if the price goes down.

On July 10, 2004, at approximately 1:07 p.m., an incoming call was received on TARGET CELLPHONE 1 from PABLO, who informed PINALES that he "may pass by there tomorrow." PINALES answered that he had not spoken to the man yet and PABLO told him to call him. PINALES told PABLO to come up anyway and PABLO agreed and stated "You may get to talk to him, but he told me to try and have at least 90 pesos." OPINION: I believe that this call refers to a new delivery of a quantity of cocaine. I believe that PABLO's statement that he would "pass by there" means that he would be delivering the cocaine to Massachusetts the next day. I also believe that "the man" that PABLO wants PINALES to speak to is OSCAR, the supplier.

On July 10, 2004, at approximately 1:09 p.m., an outgoing call was placed on TARGET CELLPHONE 1 to EDUARDO. PINALES told EDUARDO that he would have to come over because the guy just called. EDUARDO informed him that the van was still in the shop and PINALES said "Oh my God. He's heading over here tomorrow.... Check and see if they can fix it today." PINALES said that the last time he spoke with the guy, he had told him "1-1/2" but that had not been confirmed. PINALES said he was going to call him because he did not "want him to tell me something else once it is here." OPINION: I believe this conversation refers to the delivery of cocaine by PABLO the following day and that EDUARDO will need the van to pick up the delivery. I believe the reference to "1 ½" refers to $21,500, the price PINALES last told OSCAR that he wanted per kilogram of cocaine. The man PINALES is going to call to confirm is, I believe, OSCAR.

On July 10, 2004, from approximately 3:06 p.m. to 5:40 p.m., PINALES received three calls on TARGET CELLPHONE 1 from PABLO in which PABLO told PINALES to call the guy (meaning, I believe, OSCAR) because he was waiting. PINALES told PABLO he would call and then told him that he could not get him and kept getting voicemail. PABLO asked if he had the "8523" number and PINALES said he did. PABLO said to keep trying him because he sometimes has bad reception.

On July 10, 2004, at approximately 5:47 p.m., an incoming call was received on TARGET CELLPHONE 1 from 646-519-9415, a number with an unknown subscriber. PINALES spoke to CUBA. PINALES told him that the "O" had called and that "they're coming here and I'm calling him over there to see if we can straighten out the number... because Primo has already called me saying that he will be coming here tomorrow." CUBA told PINALES to "tell him to come at 21" and PINALES said "if he comes in at 22, we could do something." They then discussed EDUARDO and his problem with

7

money and PINALES said "When there's a collection, I write it down for him and then when we're going to deliver: 'Look you should have this much over there.' Isn't that how I used to do it with you?"

**OPINION: I believe this call again refers to the delivery of a supply of cocaine that is scheduled to occur the next day. I believe that when PINALES says he has to call the "O" to see if he can straighten out "the number", he is again referring to the price of cocaine. In my opinion, "21 ½" means $21,500 and "22" means $22,000, the price for a kilogram of cocaine. The reference to EDUARDO and writing the numbers down shows that PINALES keeps an accounting of money collected in payment for cocaine and money to be delivered to New York.**

On July 10, 2004, at approximately 5:52 p.m., an incoming call was received on TARGET CELLPHONE 1 from EDUARDO. PINALES spoke to EDUARDO. PINALES told EDUARDO that "these people are coming but I have to give them some 'papele." EDUARDO said he was on top of that. PINALES then said he had to talk to the man over there because he agreed to "1 ½".

**OPINION: I believe this call refers again to the delivery of cocaine the following day and the need to give PABLO "papele" which means money. The call also refers to the need to call OSCAR to get the price lower.**

On July 10, 2004, at approximately 5:56 p.m., an outgoing call was placed on TARGET CELLPHONE 1 to 857-544-2117. PINALES spoke to JOSE. PINALES told JOSE the people were coming and he needed to give them a "papelito" and he asked JOSE if he had any over there.

**OPINION: I believe that in this call PINALES is looking for money to pay PABLO.**

On July 10, 2004, at approximately 5:58 p.m., an outgoing call was placed on TARGET CELLPHONE 1 to 978-996-1764. PINALES spoke to HIPOLITO. PINALES told him the people were coming and that he had to give them some money. PINALES asked HIPOLITO if that "baina" had come up. HIPOLITO asked if he owed 7 ½ and said he would see if he could collect.

**OPINION: I believe that this call shows again that PINALES is reaching out to customers who bought cocaine and trying to collect the money they owe so he can give it to PABLO.**

On July 10, 2004, at approximately 6:41 p.m., an outgoing call was placed on TARGET CELLPHONE 1 to 347-612-2323, subscribed to by Nelson Fernandez, New York, NY. PINALES spoke to PABLO. PINALES told PABLO that he had not reached the man yet, but that he could still come because he had talked to him before and told them what there was. PABLO agreed.

On July 10, 2004, at approximately 6:54 p.m., an outgoing call was placed on TARGET CELLPHONE 1 to 617-640-1511. PINALES spoke to EMILIO. EMILIO told him he only had 8,000 pesos there and that he had to go to Everett. PINALES told him they were

04697

definitely coming tomorrow and EMILIO asked "What's the price it's coming at?"
PINALES said it would be around four (4) like he told him and EMILIO told him to cut it
down.

**OPINION: I believe this call again shows that PINALES is collecting money from
customers to pay PABLO. I believe the call also reveals that PINALES is going to
charge his customers, like EMILIO, $24,000 per kilogram of cocaine because "four
(4)" refers to $24,000.**

On July 10, 2004, at approximately 7:53 p.m., an incoming call was received on
TARGET CELLPHONE 1 from the Dominican Republic. PINALES spoke to OSCAR.
OSCAR told PINALES he had a "cosita" (little thing) around for him. PINALES asked
OSCAR "How much?" OSCAR said "you tell me." PINALES then said that he told him
that it could not be done for more than "that" and OSCAR asked more than what?
PINALES then said they should not be talking on the phone this much and the call was
disconnected.

**OPINION: I believe that the term "cosita" refers to cocaine.**

On July 10, 2004, at approximately 8:00 p.m., an incoming call was received on
TARGET CELLPHONE 1. PINALES spoke to OSCAR. PINALES told OSCAR that
when they spoke before they had agreed on 1 ½ and OSCAR said "No way, man, it's
going to be 2." PINALES complained about the price being too high and OSCAR told
him: "If you make it difficult for me ... it's going to happen like the other day. Look, I
had everything ready to send it to you last week ... and nothing happened.... It's going for
a higher price in the city; I have a couple of people around there and I have everything
ready for you.... Listen to me, so that you stop yelling at me and stop crying, I'm going to
tell you how I work. I can not do it with the number that you want because this belongs
to a friend of mine and each one has to make a profit.... I can leave it at 22 flat even
though I haven't talked to him...." OSCAR explained that they had to cover expenses.
PINALES asked how many were coming and OSCAR said "in total is two hundred (200)
pesos. And you know that you're not under any pressure with me at all. I wish I could
give it to you at 1,000 pesos and I can get my share anyhow ... but I won't make a profit
then." OSCAR then told PINALES that they would be there at "11:00 in the morning.... I
also have another job which has been already promised to another person ... I'm going to
give it to you for less." OSCAR then added "It's a big responsibility when we look at the
whole picture.... Right now we are talking 600 something 'baina." OSCAR then
explained that transportation was difficult and expensive and reminded PINALES to be
on standby early.

**OPINION: I believe that this conversation refers to the supply of cocaine that
PINALES was getting from OSCAR to be delivered by PABLO the following day. I
believe that the final price per kilogram that PINALES was paying for the cocaine
was "22", meaning $22,000. I also believe the reference to the "whole picture" being
"600 something baina" means that OSCAR has a supply of 600 plus kilograms of
cocaine to distribute and that PINALES will get a significant amount of that to
distribute. The call also shows that OSCAR is responsible for the transportation**

9

04698

**and the importation of the cocaine into the United States.**

On July 10, 2004, at approximately 8:12 p.m., an outgoing call was placed on TARGET CELLPHONE 1 and PINALES spoke to EDUARDO. PINALES told EDUARDO they are coming early and EDUARDO said he would be in Boston by 7:00 in the morning. PINALES told EDUARDO that they "squared it out at two (2)."
**OPINION: I believe that in this call PINALES is telling EDUARDO to be ready for the delivery of cocaine early the next morning and that he got the cocaine for $22,000 per kilogram.**

On July 11, 2004, at approximately 9:18 a.m. and 9:50 a.m., two incoming calls were received by PENA on TARGET CELLPHONE 2 from EDUARDO. EDUARDO first asked PENA to go see those guys over at Fall River and pick up some papers for him and then called him back and told him to head back and come over to the house so that they could switch vehicles.

On July 11, 2004, at approximately 10:16 a.m., an outgoing call was placed on TARGET CELLPHONE 1 to EDUARDO. PINALES spoke to EDUARDO. EDUARDO complained that PINALES had not been answering the phone. EDUARDO told PINALES that PABLO wanted to call him. EDUARDO said that he had not yet met with PABLO. EDUARDO explained that he had sent Richard (PENA) over to meet "T", but that "Primo" (meaning PABLO) had called right then and so EDUARDO told Richard to come back. PINALES stated he was going to call PABLO.
**OPINION: I believe this call relates to the delivery of cocaine by PABLO that EDUARDO is supposed to pick up.**

On July 11, 2004, at approximately 10:17 a.m., an outgoing call was placed on TARGET CELLPHONE 1 to 347-612-2323, subscribed to by Nelson Fernandez, New York, NY. PINALES spoke to PABLO. PABLO said he could meet him in a little while and PINALES told him that he had just spoken to the guy that was going to meet with him and that he was "the same guy you always see over there." PINALES told PABLO to call him and asked if he could wait about an hour. PABLO agreed.
**OPINION: I believe that in this call PINALES is telling PABLO that EDUARDO is going to meet him to pick up the cocaine.**

12.    Agents followed EDUARDO who was driving a green 1994 Ford Explorer,

MA registration no. 13 EB 29, registered to Richard Pena, in an attempt to observe the meeting

with PABLO, but lost him in the New Market Square area of Boston, MA. Thereafter, the

following call was received:

On July 11, 2004, at approximately 12:00 p.m., an incoming call was received on

TARGET CELLPHONE 2 from EDUARDO. PENA spoke to EDUARDO. EDUARDO told PENA to meet him at the house in 20 minutes and to be careful.

13.    At approximately 12:30 on July 11, 2004, agents observed two Hispanic

males, believed to be EDUARDO and PENA, remove a large suitcase from the Ford Explorer

that EDUARDO had been driving earlier when he was going to meet with PABLO and had

evaded surveillance. Agents observed these two males carry the large suitcase into the front door

at 7 Knight Street (Target Location 1). Following these suitcases being brought into Target

Location 1, the following calls were intercepted:

On July 11, 2004, at approximately 12:49 p.m., an outgoing call was placed on TARGET CELLPHONE 1 and PINALES spoke to EDUARDO. PINALES asked what happened and EDUARDO said that "everything is calm. I'm here at the house after meeting with Primo...(meaning PABLO)" PINALES said "Oh, so you went to get him already?" EDUARDO answered "yes, I'm relaxing now. I'm at the house with my friend Richard." **OPINION: I believe that in this call EDUARDO is telling PINALES that he already met with PABLO and picked up the cocaine and that everything was okay.**

On July 11, 2004, after PABLO had delivered a quantity of cocaine to the PINALES organization, at approximately 3:05 p.m., an outgoing call was placed on TARGET CELLPHONE 1 to 978-996-1764. PINALES spoke to HIPOLITO. PINALES told HIPOLITO that he was calling to let him know that those people have already arrived. HIPOLITO said to "send it to me early tomorrow" and PINALES said that was not a problem. HIPOLITO asked "at what mileage did it go down" and PINALES said "Four (4) was the most he was able to go down." HIPOLITO said "okay." **OPINION: I believe that "those people have already arrived" referred to the cocaine having been delivered and HIPOLITO tells PINALES to send him some cocaine the next day. I believe the reference to the "mileage" it went down to is a reference to the price of the cocaine and PINALES' statement that it went down to "four (4)" means that the price he would charge HIPOLITO was $24,000 per kilogram.**

On July 11, 2004, at approximately 8:35 p.m., an incoming call was received on TARGET CELLPHONE 1 from EDUARDO. PINALES spoke to EDUARDO. EDUARDO said he would cut it up today. PINALES said "one (1) and one (1)" and EDUARDO said "Okay. One and one. Then ... do you put the shiny stuff in there?" PINALES said "Yes. Finish it off with the other stuff." EDUARDO asked "Manny, did you say it was from thirty-one (31) or thirty (30)?" and PINALES said "thirty (30)." **OPINION: I believe that in this call PINALES is instructing EDUARDO in how to**

11

cut the cocaine and the proportion to use to mix the cocaine with a cutting agent. Thus, "one and one" refers to a proportion for the mixture.

On July 11, 2004, at approximately 10:31 p.m., an incoming call was received on TARGET CELLPHONE 1 from EDUARDO. PINALES spoke to EDUARDO. EDUARDO asked "You told me that the shiny stuff ... to pour it all in?" PINALES said "No. The one that is ... the one coming back.... That one goes whole." EDUARDO asked "It goes whole?" and PINALES said "then finish it off with the other one." EDUARDO said that was fine and then asked "Then it will be 500 pesos, right?" and PINALES agreed.
**OPINION: I believe that this call again refers to the processing of the cocaine.**

## 2. Distribution of Cocaine to Customers After July 11th Delivery of Cocaine

14.    Based upon intercepted calls, surveillance and the overall investigation, I believe that

after receiving this delivery of cocaine, the PINALES organization began distributing cocaine to

their customers. Following are examples of calls regarding the distribution of cocaine by the

PINALES organization to their customers:

### a)   Sale to EMILIO LNU

15.    The following intercepted calls reveal that EMILIO attempted to obtain a lower price for

cocaine from PINALES and ultimately purchased a kilogram of cocaine on July 15, 2004:

On July 11, 2004, at approximately 5:51 p.m., an incoming call was received on TARGET CELLPHONE 2 from 617-640-1511. PENA spoke to EMILIO. EMILIO asked PENA how it was around there and PENA answered "Everything is good, Everything is fine now." EMILIO then told PENA to take out two (2) for him and PENA said "no problem."
**OPINION: I believe that the reference to two (2) means two kilograms of cocaine and that PENA tells EMILIO it is no problem because they just received a supply of cocaine from PABLO.**

On July 11, 2004, at approximately 5:57 p.m., an incoming call was received on TARGET CELLPHONE 1 from 617-640-1511. PINALES spoke to EMILIO. EMILIO told PINALES to send the guy because he had "it" there. PINALES asked him how much he wanted and EMILIO asked him if he was ready now. EMILIO said he was going to get "four" and PINALES said he would send it to him if he sent him "that." EMILIO said he was going to Santo Domingo, but that he was going to leave a guy here. PINALES said that if he was not going to be here that it was better to do one at a time. PINALES

12

told EMILIO he was going to have Richard pick that up ... that he needed it to complete a "thing" for them. EMILIO said he had 18 there.

**OPINION: I believe EMILIO's initial reference to having "it" there referred to money he had for PINALES. His reference later to having "18" is, I believe, the amount of money he had in payment for cocaine he already received. I believe PINALES' reference to needing it to complete a thing means that he needs the money to pay PABLO for a supply of cocaine. I also believe that EMILIO's statement that he is going to get "four" refers to four kilograms of cocaine that he wants to get from PINALES now that PINALES is restocked with cocaine. I believe that PINALES' instruction that it is better to do it one at a time means one kilogram at a time.**

On July 11, 2004, at approximately 6:09 p.m., an incoming call was received on TARGET CELLPHONE 1 from 617-640-1511. PINALES spoke to EMILIO. EMILIO asked PINALES what was "the exit" that they were going to take and when PINALES said he had already told him, EMILIO said he could not do it. EMILIO then said "if you leave it at twenty-three and a half (23 ½) we can do it." PINALES said he could not. EMILIO then told PINALES that he got yesterday from Maria Eugenia's sister-in-law for "twenty-three-two." PINALES said "no" and "what I'll do is if I can't get them out, I'll return them that and they don't want to understand." EMILIO said he couldn't go that high and PINALES said "Damn, let me call Richard for him to come back."

**OPINION: I believe the reference to "exit" was a code word used by EMILIO for the price of the cocaine. I believe the term "twenty-three-two" refers to $23,200 which is the price that EMILIO got a kilogram of cocaine for from someone else, which is lower that the price PINALES is asking. In this call, I believe EMILIO is attempting to get PINALES to lower the price he wants to charge EMILIO for the cocaine.**

On July 11, 2004, at approximately 6:10 p.m., an outgoing call was placed on TARGET CELLPHONE 1 to TARGET CELLPHONE 2. PINALES spoke to PENA. PINALES told PENA not to go see that nasty guy and not to go over there anymore. He also told him to come over so he could tell him something.

**OPINION: I believe that the nasty guy refers to EMILIO and PINALES is telling PENA not to see him anymore because he is getting cocaine from someone else.**

On July 15, 2004, at approximately 3:03 p.m., an incoming call was received on TARGET CELLPHONE 1 from 617-640-1511. PINALES spoke to EMILIO. EMILIO told PINALES that he could not sleep the other night because of what PINALES had told him. EMILIO then asked PINALES if he could lower it a little bit for him and PINALES said "No, man, I can't do that. We are 4 people, to make 300 pesos, man." PINALES asked how many he was going to get, and EMILIO said "one (1), that's it."

**OPINION: I believe that in this call when EMILIO tells PINALES he is going to get one (1) he means one (1) kilogram of cocaine. I also believe PINALES is telling EMILIO that he can not lower the price because they have to split the profit**

04702

between four people.

On July 15, 2004, at approximately 5:29 p.m., an outgoing call was placed on TARGET CELLPHONE 2 to 617-640-1511. PENA spoke to EMILIO. PENA asked "You only told me about one (1) paper, right?" and EMILIO confirmed "Just one (1)."
**OPINION: I believe the reference to one (1) refers to one (1) kilogram of cocaine and that PENA is confirming that EMILIO wants to buy one kilogram of cocaine.**

  b)  <u>Sale to JOSE LNU</u>

16.    The following intercepted calls show that PENA distributed cocaine to a customer named

JOSE on July 15, 2004:

On July 15, 2004, at approximately 9:50 a.m., an incoming call was received on TARGET CELLPHONE 2 from 857-544-2117. PENA spoke to JOSE. JOSE asked if PENA had a "rubia" and PENA said he could be there in 20 minutes. JOSE asked PENA to look for a pretty one.
**OPINION: I believe the reference to "rubia" meaning "blonde" refers to a kilogram of cocaine and JOSE is asking for a good quality one by asking for a "pretty" one.**

On July 15, 2004, at approximately 10:57 a.m., an incoming call was received on TARGET CELLPHONE 2 from 857-544-2117. PENA spoke to JOSE. JOSE told PENA "It is not white, white" and PENA said "that's the way it is because other people have...." JOSE said he needed one for tomorrow that has to be "white, white." PENA said he had to check again, but explained "you know it is from that man and he doesn't say anything."
**OPINION: I believe that in this call JOSE is complaining about the quality of the cocaine because it is not "white, white" and telling PENA that he needed a good one for the next day.**

  c)  <u>Sale to Another Customer referred to as "PRIETO"</u>

17.    The following intercepted calls demonstrate that an individual referred to as "Prieto" is a

customer of the PINALES organization and purchased 5 kilograms on July 17, 2004:

On July 17, 2004, at approximately 3:30 p.m., an incoming call was received on TARGET CELLPHONE 1 from EDUARDO. PINALES spoke to EDUARDO. EDUARDO said that he was "talking with Preito (black guy) friend of mine and he is telling me that he is going to the party today and wants to know if he can get 5 tickets to set the table and shit ... right away." PINALES answered that if he is not going to take long, then that was okay. EDUARDO said he was "going to resolve the three (3) tickets

14

right away :.. in about an hour and for the rest he will take a little while longer."
EDUARDO asked if he could give it to him at four (4) since he was already at four (4)
and PINALES agreed. PINALES then asked EDUARDO if "T" had brought something
and EDUARDO said he was still putting it together and was coming later.
**OPINION: In this call, I believe the reference to "5 tickets" is a reference to 5
kilograms of cocaine. I believe EDUARDO's statement that Prieto is going "to
resolve three" right away means that Prieto is going to pay for three kilograms right
away and owe them for the other two. The reference to giving it to him at "four (4)"
means $24,000 and is a reference to the price per kilogram they are charging for the
cocaine.**

On July 17, 2004, at approximately 3:27 p.m., an incoming call was received on
TARGET CELLPHONE 2 from EDUARDO. PENA spoke to EDUARDO. EDUARDO
asked PENA to bring him over "the five (5) tickets" because his "friend Prieto wants to
party.... Make sure you get the good 'asientos' (seats). You know which ones, the
"Prieticos" (the dark ones), right?" PENA said he would be there in 20 minutes.
EDUARDO told him that he wanted him to follow his friend because other people were
there. EDUARDO said he left a phone there yesterday in the middle of the console.
**OPINION: Again, I believe the reference to "5 tickets" means 5 kilograms of
cocaine and EDUARDO is asking PENA to deliver it. I believe that "asientos"
meaning seats also refers to kilograms of cocaine.**

d)  **Distribution to Tajh WHITE**

The following calls show distributions of cocaine to a customer named Tajh WHITE,

referred to as "T", on July 11 and 12, 2004, July 23, 2004, and August 12, 2004:

**July 11 and 12, 2004**

On July 11, 2004, at approximately 3:01 p.m., an outgoing call was placed on TARGET
CELLPHONE 1 to EDUARDO. PINALES spoke to EDUARDO. PINALES told
EDUARDO that "CUBA called me and told me that "T" spoke to him ... Cubano said you
should go there around 10:00 p.m. ... He said that he wants ten (10) things." EDUARDO
asked what CUBA was talking about and called him a "dirty guy" stating that he had just
talked to him and was on his way there.
**OPINION: I believe that PINALES is telling EDUARDO to deliver cocaine to "T"
as CUBA instructed. I believe that "ten (10) things" refers to ten kilograms of
cocaine. I also believe that EDUARDO is upset that "T" went over his head by
calling CUBA when EDUARDO had already arranged to meet him.**

On July 11, 2004, at approximately 3:06 p.m., an incoming call was received on
TARGET CELLPHONE 1 from EDUARDO. PINALES spoke to EDUARDO.
EDUARDO asked PINALES what CUBA had said and PINALES said that CUBA said

15

"T" had called him and that you should go there at 10:00. EDUARDO answered "Who
knows what "T" told him. He can't understand much English." PINALES said "You
know we have to lower it for them, but he offered it to them at four-two-fifty (4 - 250)
that's fine." EDUARDO asked why CUBA talked if he was not here and that he should
ask PINALES' permission before doing anything and then PINALES would tell him if
it's doable or not. PINALES told EDUARDO that he told CUBA that EDUARDO was
pissed off and EDUARDO said he would tell him everything when he spoke to him.
EDUARDO then told PINALES that he had reprimanded "Prieto" who only brought "19
pesos." EDUARDO then told PINALES "These people came different ... they're not the
same like the others." When PINALES asked how they looked, EDUARDO said "Some
look okay. Other 'Muchachitos' look so-so.... I'm going to call you later to go over there.
I would like to discuss with you concerning the 'muchachos' that arrived."
**OPINION: I believe that the reference to "four-two-fifty" means $24,250 and refers
to the price per kilogram of cocaine that CUBA told "T". I believe the reference to
"19 pesos" refers to money that EDUARDO collected from "Prieto" for cocaine. I
also believe the terms "muchachitos" and "muchachos" are code terms used for the
kilograms of cocaine and that EDUARDO is telling PINALES that the cocaine does
not all look to be of good quality and he wanted to discuss it with him.**

On July 12, 2004, at approximately 2:00 p.m., an incoming call was received on
TARGET CELLPHONE 2 from EDUARDO. PENA spoke to EDUARDO. EDUARDO
asked if PENA was far and asked him to take "five (5) tickets for the game to this guy
from Fall River ... to "T"." PENA agreed and EDUARDO added "Like yesterday give
them a mix of one (1) good seat and one (1) bad seat."
**OPINION: I believe that the reference to "5 tickets" means 5 kilograms of cocaine
and EDUARDO is telling PENA to deliver 5 kilograms to "T" in Fall River and to
mix some good cocaine with some bad cocaine.**

On July 12, 2004, at approximately 6:02 a.m., an incoming call was received on
TARGET CELLPHONE 1 from EDUARDO. PINALES spoke to EDUARDO.
EDUARDO said he sent PINALES "32 pesos" and he had "nine pesitos" left with him.
EDUARDO asked "Had we agreed that Bori lives on exit 25 or 24? What's the exit?"
PINALES said to "leave him on twenty four five (24-5), maybe he'll move better."
EDUARDO said he was going to head over there and he would be back tomorrow
evening. PINALES said that they had to try to move because they were delayed and
EDUARDO said he would be back tomorrow once he worked it out with them.
PINALES then told EDUARDO to talk to the people in Fall River and see if they wanted
to get the other ones. EDUARDO said he gave it to them already. PINALES asked "the
other five (5)?" and EDUARDO said "Yes." PINALES said "So they have ten (10) pesos
right?" and EDUARDO said "Yes." EDUARDO then confirmed "You had told me 250
right?" and PINALES said "Yes. That's 'El Viejito Daniel' told them."
**OPINION: I believe the question as to whether Boris lives at "exit 25 or 24" is a
reference to the price that Boris is going to pay per kilogram of cocaine, and "24"
means $24,000 and "25" means $25,000. PINALES' response to leave it at "twenty-**

16

four-five" means $24,500 per kilogram. I believe the reference to "the other five" refers to five kilograms of cocaine and the reference to "ten pesos" refers to 10 kilograms of cocaine. EDUARDO's statement regarding "250" refers to the price per kilogram that the customer from Fall River was going to pay for the ten kilograms, and "250" means $24,250 (the price CUBA had quoted them).

### July 23, 2004

On July 23, 2004, at approximately 4:23 p.m. and 4:57 p.m., EDUARDO and PENA had two conversations intercepted over TARGET CELLPHONE 2 regarding the delivery of cocaine to the customers in Fall River. In the first call, EDUARDO told PENA that the "Fall River people are here ... [but] they are driving a small car and that "aire" does not fit in there." EDUARDO told PENA that he would thus have to pass by there. In the next call, EDUARDO told PENA to give them time to get back and then take "el aire" for him. PENA asked what they wanted and EDUARDO said "el aire and the five tickets." **OPINION: I believe these calls relate to the delivery of cocaine to the Fall River customers. I believe "el aire" refers to the cocaine and "five tickets" refers to the quantity of cocaine, most likely 5 kilograms because the quantity was too large to fit in a small car.**

Then, on July 24, 2004, between 11:36 a.m. and 1:05 p.m., there were three calls between PENA and EDUARDO regarding the delivery of this cocaine to the Fall River customers, also referred to in other intercepted calls as "T". In the first call, EDUARDO told PENA that the guys from Fall River wanted him to take them "the aire." PENA agreed and said he would be home at 12:00 and then head over there. In the second call at 12:22 p.m., EDUARDO asked PENA if he was almost there and PENA answered "No. I'm just getting on the expressway in Dedham." In the final call, EDUARDO asked PENA if he arrived yet and PENA said he was on his way back. EDUARDO asked him if he left the ten (10) pesos that he gave him and PENA said yes. **OPINION: Again, I believe that these calls relate to the delivery of cocaine to the customer in Fall River. I believe the term "aire" refers to the cocaine and "ten pesos" likely refers to the quantity of cocaine.**

### August 12, 2004

On August 5, 2004, at approximately 10:04 p.m., TARGET CELLPHONE 3 placed an outgoing call to 508-287-9662. EDUARDO spoke to Tajh WHITE. EDUARDO told Tajh WHITE that they should be able to get together tomorrow afternoon. EDUARDO said he should be leaving about 2:00 once he fixed the license and that was what was taking him so long. Tajh WHITE said he would come up to talk to EDUARDO. EDUARDO said he would let Tajh WHITE know when he was on his way and give him at least 40 minutes so "you can... we can get together up there." Tajh WHITE said "perfect." **OPINION: I believe this call relates to a meeting between EDUARDO and Tajh**

17

**WHITE, a customer of the PINALES organization, for the purpose of discussing
business regarding the distribution of cocaine. The call shows that the Tajh
WHITE is approximately 40 minutes from the Boston area, which is consistent with
Tajh WHITE being located in the area of New Bedford, Massachusetts.**

On August 12, 2004, at approximately 4:44 p.m., TARGET CELLPHONE 3 received an
incoming call from 508-287-9662. EDUARDO spoke to Tajh WHITE. Tajh WHITE
asked if EDUARDO was still around and EDUARDO said he would be around in an hour
and a half. Tajh WHITE asked if "that old dude" could go to Mackey's house and
EDUARDO said that was no problem. Tajh WHITE asked when he could go and
EDUARDO asked him to wait until he got there because he wanted to look at "those parts
for your car" so that he got the right ones. Tajh WHITE said that his other boy fixed most
of that "radiation" and that he was "just gonna need like, probably only like three (3), four
(4) parts, just the same little bullshit. Cause I'm leaving Friday anyways and he can fix
the rest of the car when I get back." Tajh WHITE said he would wait for EDUARDO,
confirmed that he would be coming to Mackey's house, and told EDUARDO to call him.
**OPINION: I believe "the old dude" is a reference to PENA who is also referred to
in other calls as "viejo" and who has delivered to the Fall River customers before. I
believe "parts for your car" refers to cocaine and Tajh WHITE's reference to
needing 3 or 4 parts is a reference to the quantity of cocaine he wanted from
EDUARDO. I believe the call relates to scheduling a meeting for the delivery of
cocaine to Tajh WHITE.**

On August 12, 2004, at approximately 6:36 p.m., TARGET CELLPHONE 3 received an
incoming call from 508-287-9662. EDUARDO spoke to Tajh WHITE. EDUARDO said
he was just about to call Tajh WHITE and said he was going to head out there in 2-3
minutes. EDUARDO then asked if Tajh WHITE wanted him to bring the "front axle."
Tajh WHITE answered "front axle, rear axle and then like one or two spark plugs. It
don't really matter, you know, whatever is convenient."
**OPINION: I believe the references to "front axle", "rear axle" and "spark plugs"
are code words for quantities of cocaine that EDUARDO is going to deliver to Tajh
WHITE.**

On August 12, 2004, at approximately 7:32 p.m., TARGET CELLPHONE 3 received an
incoming call from 508-287-9662. EDUARDO spoke to Tajh WHITE. EDUARDO said
it would take him about 15 more minutes and Tajh WHITE told him to take his time
because he had to wait for Mackey who would be 10 minutes and then it would take him
15 minutes to get over there.
**OPINION: This call relates to the delivery of cocaine by EDUARDO.**

On August 13, 2004, at approximately 11:38 a.m., TARGET CELLPHONE 3 placed an
outgoing call to 508-287-9662. EDUARDO spoke to an Tajh WHITE. EDUARDO
asked "You said thirty-three (33) right? ... You gave me thirty-three (33) more, thirty [u/i]
more." Tajh WHITE answered "Yeah. That's straight, in this case [u/i] 'till like uh, until

18

04707

like 12:00, 1:00, so .... He said he's gonna call unless we ... I'll make sure. I'm gonna call him when I get off." EDUARDO said "Alright. That's good."

**OPINION: I believe that "thirty-three (33)" refers to a sum of money, most likely $33,000, that Tajh WHITE paid to EDUARDO for cocaine previously obtained by Tajh WHITE, and that EDUARDO is confirming the amount paid with Tajh WHITE.**

3. Delivery of Cocaine on August 28, 2004

18.

On August 27, 2004, I received information

that a supply of cocaine was going to be delivered to the Boston area to

an individual who was not believed to be associated with the PINALES organization. Based

upon that information, agents attempted to surveill a meeting between PABLO and the individual

who was believed to be receiving the cocaine, but were unsuccessful. On August 28, 2004, I

learned that earlier that morning

OSCAR told PINALES that he had some "stuff" in

PINALES' area because someone else had backed out and asked if he could take it. PINALES

agreed and they agreed to a price of "1 ½." I believe that "stuff" referred to cocaine and "1 ½"

meant $21,500, the price per kilogram.

19.                              I reviewed the video recorded by the surveillance camera

outside of 7 Knight Street (**Target Location 1**). At approximately 1:00 p.m. on August 28,

2004, the surveillance camera recorded a video of PENA removing two large suitcases and other

large bags from the Ford Explorer he drives and carrying them into 7 Knight Street, Hyde Park

(**Target Location 1**).

20.    Pen Register Information revealed that on the morning of August 28, 2004, TARGET

19

04708

CELLPHONE 4, presently being used by PINALES, placed an outgoing call at approximately

9:20 a.m. to 917-213-6793, a number known to be used by PABLO. Thereafter, TARGET

CELLPHONE 4 placed calls at approximately 9:23 a.m. and again at 10:08 a.m. to TRAGET

CELLPHONE 5, presently being used by PENA. At approximately 10:30 a.m., TARGET

CELLPHONE 5, presently being used by PENA, placed an outgoing call to TARGET

CELLPHONE 4 and then had 5 consecutive calls with 917-213-6793, the number used by

PABLO, at 10:47 a.m., 11:00 a.m., 11:29 a.m., 11:50 a.m., and 11:52 a.m.

21.    Based upon this calling activity of TARGET CELLPHONES 4 and 5 which are now

being used by PINALES and PENA,

        and surveillance of PENA recorded on the camera at 7 Knight Street, I believe that

PENA met with PABLO on the morning of August 28 and received cocaine and that the

suitcases and bags that PENA carried into 7 Knight Street contained cocaine.

### 4. Storing Cocaine at 115 Navarre Street

22.    At approximately 6:00 p.m. on September 12, 2004, by means of a surveillance camera

located at 7 Knight Street, Hyde Park **(Target Location 1)** agents observed a Hispanic male

enter 7 Knight Street carrying a suitcase. Thereafter agents proceeded to the location of 7 Knight

Street and observed a Hispanic male exit 7 Knight Street with a suitcase and load the suitcase

into the back of the Ford Explorer registered to PENA. Agents thereafter followed the Ford

Explorer driven by this Hispanic male to 115 Navarre Street **(Target Location 2)** and saw the

male extend the handle of the suitcase and pull it up the stairs and into 115 Navarre Street.

23.    On September 14, 2004, agents observed several Hispanic males moving furniture and

other items from 107 Durnell Avenue, Roslindale, MA, to 115 Navarre Street, Hyde Park, MA

(Target Location 2). PENA and EDUARDO had previously been observed and were believed

to reside at 107 Durnell Avenue.

24.     From September 14, 2004 to the date of this Affidavit, agents have observed CUBA

coming and going from 115 Navarre Street (Target Location 2) and that is the location where he

is currently believed to be residing.

25.     Based upon the foregoing and also based upon subsequent surveillance detailed below

regarding distributions of cocaine, I believe that CUBA transferred a portion of the supply of

cocaine located at 7 Knight Street (Target Location 1) to 115 Navarre Street (Target Location

2) in order to facilitate his distribution of cocaine and avoid returning to 7 Knight Street where

the larger quantity of cocaine is believed to be stored.

### 5. Meeting Between PINALES and CS on September 21, 2004

26.     On September 21, 2004, PINALES met with CS[1] at the Park Avenue Market (Target

Location 2). During this meeting, PINALES told CS that he had "a job there," meaning, I

believe, cocaine. CS asked PINALES how much he got it for and PINALES answered

"expensive ... I have to move it at 23 so I don't lose." CS asked how many he had and PINALES

said "They gave him eighty (80)," which I believe means 80 kilograms. PINALES then added

"three have been moved," which I believe means that, as of September 21, 2004, only 3

---

[1] The CS has been cooperating and working as a paid informant for DEA since 1999.
The CS has admitted to previously being involved in large-scale cocaine trafficking. The CS has
provided reliable information which has led to the arrest of numerous defendants involved in
illegal narcotics trafficking activities and the seizure of significant quantities of narcotics and
United States currency. For example, the CS provided information that contributed to the
initiation of two multi-jurisdictional drug trafficking wiretap investigations which resulted in the
arrest of twenty-eight (28) persons and the seizure of multi-kilogram quantities of heroin and
cocaine. The CS, based on its prior narcotics trafficking activities, is familiar with the manner
and means of business of organizations similar to the targeted drug trafficking organization.

21

kilograms of the 80 kilograms had been sold. CS and PINALES then discussed the possibility of the CS assisting PINALES in moving the cocaine. CS said it would check with its customers.

27.    Based upon this meeting, I believe that the quantity of cocaine that PINALES received on August 28, 2004 and that was carried into 7 Knight Street (**Target Location 1**) by PENA was 80 kilograms of cocaine, and that as of September 21, 2004, PINALES still had approximately 77 kilograms remaining.[2]  Although intercepted calls have revealed that a number of kilograms of cocaine have been distributed since September 21, 2004, from these calls I believe that less than 20 kilograms have been distributed and that the PINALES organization remains in possession of in excess of 40 kilograms.

### 6. October 6, 2004 Conversation About Location of Cocaine

28.    On October 6, 2004, CUBA and PENA had a conversation regarding where to store the cocaine, the scale and the cut - 7 Knight Street, Apt. 2R (**Target location 1**) or 115 Navarre Street (**Target Location 2**):

---

[2] On September 29, 2004, CS called PINALES to follow up on their discussion regarding CS helping PINALES move kilogram quantities of cocaine. During this telephone call, PINALES said that "all those people already went on a ride," meaning, I believe, that he had gotten rid of the kilograms of cocaine. I believe, however, that PINALES was lying to CS because a customer that had purchased a kilogram of cocaine from CUBA that day had been stopped soon thereafter and arrested after being found in possession of the cocaine. See paragraphs 36-38 below regarding the distribution of cocaine to Hernandez. Two days earlier another customer, Taj White, had also been followed and had dumped the cocaine. See paragraphs 32-34 below regarding the distribution to WHITE. Intercepted calls revealed that these two incidents and the fact that PINALES thought that HERNANDEZ may have been cooperating with the police after his arrest caused PINALES and CUBA to become very nervous. In one call on October 29, 2004, PINALES even told CUBA they had to stop for awhile. Thus, I believe that this caution was the reason that PINALES told CS that he was out of cocaine. Since then, on October 5, 2004, PINALES has called the CS and requested a meeting, which I believe is for the purpose of telling CS that he in fact does still have cocaine that he wants to move.

04711

On October 6, 2004, at approximately 3:44 p.m., an incoming call was received on TARGET CELLPHONE 5 and CUBA spoke to PENA. PENA told CUBA that he had not found that "vaina" and that EDUARDO took it. CUBA asked "What?" and PENA said "the scale." CUBA asked what they should do now because there was only one. PENA told him that they would "have to have that only at one place" and that they could keep "the 'picado' here since you're always coming here." CUBA said "Damn. I had already done something here. I had broken one up, because they want it for tomorrow or the day after tomorrow." PENA answered "weigh it and leave one part there, and bring me the other part.... and bring me the scale." CUBA agreed and said "Why don't I weigh it for you at a hundred something" PENA said "all right. You know that sometimes they ask me for 9. Some times they ask me for less than that. Sometimes they ask me for a 52." CUBA then exclaimed "Oh Damn. Now we are screwed! Because sometimes they ask me for 3 or 4." PENA said "Well let's do one think, let's have the 'picado' here" and CUBA agreed.

I believe that this call shows that both PENA and CUBA have quantities of cocaine at their locations and both are involved in the cutting, weighing and distribution of the cocaine. The location where PENA resides is 7 Knight Street, Apartment 2R **(Target Location 1)** and the location where CUBA resides is 115 Navarre Street, Floor 2 **(Target Location 2)**. I believe that "picado" refers to cutting agent that they use to process the cocaine and this call shows that they agree to keep the cutting agent at 7 Knight Street. The call further shows that they have to share a scale for the weighing of quantities of cocaine and both want the scale at their location.

### 7. Distribution to Robinson Justiniano on September 1, 2004

29.    On September 1, 2004, at approximately 9:43 a.m., the surveillance camera recorded a male arrive at 7 Knight Street in the Ford Explorer registered to and usually driven by PENA This male entered the front door of 7 Knight Street and minutes later exited 7 Knight Street carrying a white plastic bag. The male entered the Ford Explorer and left the location. At approximately 10:30 agents saw the Ford Explorer parked at 107 Durnell Avenue, Hyde Park. Both PENA and EDUARDO had been observed on numerous occasions during the investigation at this location. At approximately 10:30 a.m. a green Mercury Sable 4-door Sedan, MA

23

registration no. 88LR02, registered to PENA at 107 Durnell Avenue #1, Roslindale, MA, which

both PENA and EDUARDO had been seen driving on previous occasions, was observed by

agents leaving 107 Durnell Avenue; the driver could not be seen. At approximately 12:00 p.m.,

the Sable returned to 107 Durnell Avenue, followed by a brown Volvo Wagon, driven by a

female with a male in the passenger seat. The male was later identified as Robinson

JUSTINIANO and the female identified as Tiffany Botelho, and both were determined to live at

20 Cove Street, New Bedford, MA. Upon arrival at 107 Durnell Avenue, agents observed an

Hispanic male,[3] JUSTINIANO and Botelho approach the Ford Explorer and the Hipspanic male

open the driver's door and then the hood of the Explorer. Agents observed all three individuals

stand at the hood of the Explorer for few minutes and then proceed into 107 Durnell Avenue.

Thereafter, agents observed all three individuals leave 107 Durnell Avenue, the Hispanic male

drive away in the Sable, and JUSTINIANO and Botelho follow the Sable in their Volvo, with

Botelho driving the vehicle. Both vehicles were observed to stop and the occupants speak again

before they separated.

30.      Thereafter, the Volvo was followed and stopped by Massachusetts State Police Troopers

because it had a revoked registration. The occupants were identified, told that the vehicle would

be towed, and asked to take any personal belongings from the vehicle. Officers thereafter

conducted an inventory of the vehicle prior to it being towed, during which they observed on the

back seat a clear blue plastic bag through which they saw an orange juice container and a

rectangular shaped package wrapped in cellophane inside the bag. Based upon the officers'

---

[3] Agents assumed at the time that this Hispanic male was PENA because only PENA and
EDUARDO had been seen driving the Ford Explorer and the Sable previously and the individual
observed on September 1, 2004 did not resemble EDUARDO.

24

experience, they believed that the rectangular shaped package was approximately a kilogram of cocaine. Officers made a small incision in the package and observed a white substance believed to be cocaine inside. JUSTINIANO and Botelho were placed under arrest and advised of their Miranda rights, both denied any knowledge of the package. JUSTINIANO was allowed use of the phone and made three telephone calls to unknown individuals. A Spanish-speaking officer overheard JUSTINIANO, speaking in Spanish, tell these unknown parties that "they got me with that."

31.     Based upon the foregoing, I believe that this Hispanic male is a member of the PINALES organization, and that he went to 7 Knight Street **(Target Location 1)** to pick up cocaine on the morning of September 1, 2004. I believe that the cocaine was contained in the white bag carried out of 7 Knight Street; and that this Hispanic male delivered the one kilogram of cocaine to JUSTINIANO that was later seized from him.

### 8. Distribution to Tajh WHITE on September 27, 2004

32.     Based upon intercepted calls, surveillance, and the overall investigation, I believe that on September 27, 2004, CUBA distributed a kilogram of cocaine to WHITE and WHITE delivered money to CUBA in payment for cocaine he previously received on credit. Agents observed the meeting between CUBA and WHITE. After the meeting between them, agents followed WHITE. After WHITE discovered he was being followed, he exited the highway, pulled over, opened the trunk of his car and went into the woods. Agents saw him return to the car, close the trunk and drive away. Agents thereafter searched the wooded area where WHITE was seen and recovered a bag containing a kilogram of cocaine wrapped in tape. Thereafter, calls were intercepted between WHITE and CUBA wherein WHITE said he had to meet CUBA and then

25

calls were intercepted between CUBA and PINALES in which CUBA told PINALES what

WHITE said had happened. Below are the calls and the details of surveillance that relate to this

distribution:

> On September 26, 2004, at approximately 1:30 p.m., an incoming call was received on
> TARGET CELLPHONE 5 from 508-287-9662. CUBA spoke with Tajh WHITE.
> WHITE told CUBA he would come tomorrow.

> On September 27, 2004, at approximately 11:19 a.m., an incoming call was received on
> TARGET CELLPHONE 5 from 508-287-9662. CUBA spoke with Tajh WHITE.
> CUBA asked WHITE what time he was going to come over and WHITE said he had to
> wait for his cousin because she had his truck. CUBA said "no, man. The guy is supposed
> to come here today.... The people from ... New York City." WHITE said "Shit ... let me
> call my cousin and see when she gets out of work."

> On September 27, 2004, at approximately 2:34 p.m., an incoming call was received on
> TARGET CELLPHONE 5 from 508-287-9662. CUBA spoke with Tajh WHITE.
> WHITE said he was about to leave. CUBA asked if he would be there in an hour and
> WHITE said 45 minutes. CUBA said he would see him and asked "you know where?"
> WHITE began asking if it was "the new?" and CUBA said "No. Burger King."

33.    At approximately 3:30 p.m., agents observed CUBA meet with WHITE in

the area of the Burger King on Cummins Highway, Hyde Park, after which WHITE driving a red

Honda followed CUBA driving the Sable to the Stop & Shop Plaza also located on Cummins

Highway. At this location, agents observed CUBA exit the Sable and get into the red Honda.

After a couple of minutes, agents saw CUBA exit the red Honda and get back into the Sable.

Agents then followed the Sable to 115 Navarre Street, Hyde Park (Target Location 2) and

observed CUBA enter 115 Navarre Street (Target Location 2). Agents also continued to

observe the red Honda which remained in the Stop & Shop Parking lot and saw WHITE exit the

vehicle and enter the Pizza shop and then walk the length of the mall store fronts. At

approximately 3:44 p.m., agents observed CUBA return to the Stop & Shop parking lot in the

Sable, exit the Sable and approach WHITE on foot and both enter the Boston House of Pizza. At

26

approximately 4:04 p.m., agents saw both CUBA and WHITE exit the pizza shop. Agents then

saw CUBA take a tan plastic bag out of the rear door of the Sable. Agents then saw CUBA go to

the red Honda, open the driver's door, bend down and then immediately go to the trunk. Almost

simultaneously the trunk popped open. Agents observed CUBA place the plastic bag in the trunk

on the left side and close the trunk. After a brief conversation at the trunk of the red Honda, both

CUBA and WHITE exited in their vehicles at approximately 4:07 p.m.

> On September 27, 2004, at approximately 4:34 p.m., an outgoing call was placed on
> TARGET CELLPHONE 5 to TARGET CELLPHONE 4. CUBA spoke with PINALES.
> CUBA asked if "T" had called him and PINALES said "No." CUBA said that "T" has
> brought only 23. PINALES asked what CUBA gave him and CUBA said "one tire."
> **OPINION: I believe that 23 means $23,000, which is money WHITE paid CUBA
> for cocaine he received on credit. I believe that "one tire" refers to a kilogram of
> cocaine that CUBA gave to WHITE.**

34.    Agents followed WHITE, who was driving the red Honda, through Mattapan Square into

Milton and eventually onto route 95 South. Agents observed WHITE abruptly change from the

passing lane into the middle lane and then into the far right lane before quickly exiting Route 95

at Exit 11B. Once off the exit, at approximately 5:05 p.m. agents saw WHITE enter a gas station

where he exited the vehicle and entered the store. Agents then saw WHITE return to his vehicle

and exit the gas station, after which he was lost in traffic for a couple of minutes. At

approximately 5:11 p.m. agents saw the red Honda pulled off to the side of the road with the

trunk open and saw WHITE walking from the wooded area to the Honda. Agents saw WHITE

close the trunk, enter the vehicle and leave the area. Agents thereafter searched the wooded area

where they found a tan plastic bag containing a white plastic Marshall's bag in which there was a

yellow shoe box that contained a kilogram of cocaine wrapped in Circuit City advertisement

paper, and within that paper wrapped in tape and saran wrap.

27

On September 27, 2004, at approximately 5:06 p.m., an incoming call was received on TARGET CELLPHONE 5 from 508-287-9662. CUBA spoke with Tajh WHITE. WHITE told CUBA to come meet him at the burger place and CUBA asked him what had happened and whether everything was alright. WHITE said he had to talk to CUBA.

On September 27, 2004, at approximately 5:41 p.m., an outgoing call was placed on TARGET CELLPHONE 5 to TARGET CELLPHONE 4. CUBA spoke with PINALES. CUBA told PINALES that Tajh told him that he had been followed by 4 cars so he took an exit and dumped the stuff. CUBA told PINALES that Tajh knew where it was and that he was going to take someone to recuperate the stuff. CUBA said that he was going to send Jose to get it. CUBA said he did not believe Tajh and that it was a real mess. PINALES complained and said they would talk later.

On September 27, 2004, at approximately 8:20 p.m., an outgoing call was placed on TARGET CELLPHONE 5 to TARGET CELLPHONE 4. CUBA spoke with PINALES. CUBA told PINALES that he wanted him to talk to Jose to hear the story. CUBA said that he sat Tajh down and told him to stop the nonsense and demanded that he pay. CUBA said that he got scared when he talked to him and that he will pay. CUBA said he told him "either you kill me or I kill you." CUBA said he though Tajh did it himself with his partners. CUBA said he went over the numbers of everything with him ... "85 plus EDUARDO and 73 from here." CUBA said that he told WHITE that he had to bring the van the next day and said that when he gets here, he is going to tell him he wants the apartment.

35.     Based upon the foregoing, I believe that CUBA went to 115 Navarre Street (Target

Location 2) where he was then residing and where I believe he stores cocaine, and obtained a

kilogram of cocaine which he then distributed to Tajh WHITE. I believe that the tan bag

transferred by CUBA from the Sable he was driving into the trunk of WHITE's red Honda

contained the cocaine.

### 9. Distribution to Alex Hernandez on September 29, 2004

36.     Based upon intercepted calls, surveillance, and the overall investigation, I believe that on

September 29, 2004, CUBA met with a runner sent by HIPOLITO, a regular customer of the

PINALES organization. The runner was later identified as Alex HERNANDEZ. Calls were

intercepted on the night of September 28 between PINALES and HIPOLITO revealing that

04717

HERNANDEZ was coming to deliver $7,000 and pick up cocaine. Agents observed the meeting

between CUBA and HERNANDEZ. Thereafter, HERNANDEZ was stopped on Route 93N and

a kilogram of cocaine was found in his car. HERNANDEZ was arrested. Calls were thereafter

intercepted between HIPOLITO and PINALES in which HIPOLITO reported that HERNANDEZ

had been arrested. Below are the calls and details of the surveillance regarding this distribution

and arrest and seizure.

On September 28, 2004, at approximately 10:07 p.m., an incoming call was received on
TARGET CELLPHONE 4 from 978-996-1774. PINALES spoke to HIPOLITO.
HIPOLITO said he was going to send the guy there tomorrow ... "for him to give you the
tickets and for you to give him that." PINALES said to have the guy call him "for him to
meet el Viejo." HIPOLITO said he wanted him to do it over near his house in south
Boston with El Viejo and PINALES said that was even better. HIPOLITO said he was
going to send "7." PINALES said he thought they were somewhere over "10."
HIPOLITO asked "including the old stuff?" and PINALES said "including everything."
HIPOLITO said he would send "7" and another one soon.
**OPINION: I believe that "7" means $7,000 and this call shows that HIPOLITO is
going to send PINALES $7,000. I believe the reference by HIPOLITO that he was
sending his guy "for him to give the tickets and for you to give him that" shows that
the runner is coming not only to deliver money, "the tickets," but also to pick up
cocaine. I believe that because the runner is coming for cocaine, PINALES tells
HIPOLITO that the runner will meet with "El Viejo" referring to CUBA because
PINALES does not handle deliveries of the cocaine himself although he will meet
customer who are just dropping off money.**

On September 29, 2004, at approximately 11:47 a.m., an incoming call was received on
TARGET CELLPHONE 4 from 978-996-5928. PINALES spoke to HIPOLITO's runner,
later identified as HERNANDEZ. HERNANDEZ said "Hey Manuel, this is HIPOLITO's
guy." PINALES told him to call the following number, 617-669-1675, which is CUBA's
number.

On September 29, 2004, at approximately 12:50 p.m., an incoming call was received on
TARGET CELLPHONE 5 from 978-996-5828. CUBA spoke to HERNANDEZ.
HERNANDEZ said it was HIPOLITO's guy and told him that Manuel gave him the
number. HERNANDEZ said he was in South Boston and CUBA said to come around
Hyde Park. HERNANDEZ said he always goes to the store and CUBA said to come over
there. HERNANDEZ said he was coming "to pick up some pants and to take something
too." CUBA said that was fine.
**OPINION: I believe that the term "pants" refers to cocaine and that this call shows**

29

that HERNANDEZ works for HIPOLITO and is going to pick up some cocaine
from CUBA and also drop off "something" meaning money.

On September 29, 2004, at approximately 12:54 p.m., an outgoing call was placed on
TARGET CELLPHONE 5 to TARGET CELLPHONE 4. CUBA spoke with PINALES.
CUBA asked what he should give to "those people, to HIPOLITO" and PINALES said
"the usual." CUBA said he did not know what is usual and asked "the whole one?"
PINALES said "yes."
**OPINION: I believe that " a whole one" refers to a kilogram of cocaine and that
PINALES is telling CUBA to give HERNANDEZ a kilogram of cocaine.**

On September 29, 2004, at approximately 1:41 p.m., an outgoing call was placed on
TARGET CELLPHONE 5 to 978-996-5928. CUBA said to HERNANDEZ "come over
here" and HERNANDEZ said "Okay."

37.    At approximately 1:30 p.m., agents observed CUBA exit the Hyde Park

Market and walk to the right side of the front entrance and light a cigarette. Agents observed that

he was wearing an unzippered oversized off-white jacket. Agents then observed a red Ford

Mustang stop at the curb in front of the market and CUBA enter the passenger door. Agents saw

the Mustang drive one block and stop and then saw CUBA and another Hispanic male exit the

car. Agents then observed CUBA walk to 115 Navarre Street **(Target Location 2)** and up the

driveway of 115 Navarre Street **(Target Location 2)**. Agents thereafter observed CUBA walk

from the rear of 115 Navarre Street **(Target Location 2)** and observed that his jacket was zipped

up and he had his hands in his pockets as if he were holding something inside his jacket. Agents

saw CUBA walk back to the Mustang and enter the passenger side door. Agents saw CUBA exit

a minute later with his jacket unzippered and then saw the other Hispanic male enter the driver's

door and sit there for a few minutes before he drove away. Agents thereafter followed the

Mustang and saw it get on Route 93 traveling northbound.

On September 29, 2004, at approximately 1:59 p.m., an outgoing call was placed on
TARGET CELLPHONE 5 to TARGET CELLPHONE 4. CUBA spoke with PINALES.
CUBA asked if HIPOLITO was supposed to send "seven (7)" and PINALES said "yes."

30

CUBA said that the guy took 20 for gas and there are "6880." PINALES said he was going to call him now.

**OPINION: I believe that this call relates to the amount of money that HIPOLITO's runner, HERNANDEZ, delivered to CUBA in payment for cocaine received on credit.**

38.    State Police Trooper John Costa stopped the Mustang on Route 93 in the vicinity of

Exit 39 for speeding. Upon a search of the vehicle by State Troopers and canines, one kilogram

of cocaine was recovered from a man-made hide under the rear passenger seat and the driver of

the vehicle, Alex HERNANDEZ, was arrested.

> On September 29, 2004, at approximately 4:57 p.m., an incoming call was received on TARGET CELLPHONE 4 from 978-996-1774. PINALES spoke to HIPOLITO.. HIPOLITO said "They arrested the guy, man" and PINALES said "don't tell me that." HIPOLITO said it happened in Hanover and said "This comes from the devil man." HIPOLITO said he was going to call and find out what was going on.

39.    Based upon the foregoing, I believe that CUBA went to 115 Navarre Street (Target

Location 2) where he was then residing and where I believe he stores cocaine, and obtained a

kilogram of cocaine. I believe he carried the kilogram of cocaine from 115 Navarre Street

**(Target Location 2)** inside his zippered jacket and thereafter distributed it to HERNANDEZ.

## IDENTIFICATIONS OF LOCATIONS SUBJECT TO SEARCH

### Target Location 1

40.    **Target Location 1** is 7 Knight Street, Apartment 2R, which is the apartment located on

the Second Floor at 7 Knight Street on the right side of the building as one stands facing the front

of the building.

41.    7 Knight Street is a yellow multi-family building in which 4 apartments are

believed to be located based upon records from Boston Edison and surveillance conducted. The

apartments are designated 1R, 1L, 2R, and 2L based upon the floor and the side of the building

04720

on which the apartment is located, with "R" meaning right and "L" meaning left. The front door is located on Knight Street. On the second floor directly above the front door is a window that is located in the common hallway. The two windows on the second floor to the right of the hallway window, as one stands facing the front of the building, are the windows of **Target Location 1**. The front door enters onto a common hallway on the first floor. On the first floor, there are two doors, one on the right and one on the left, which are believed to lead to apartments on either side of the building. A staircase leads to the second floor. As one enters the front door of the building, one faces the staircase. Approximately 6 stairs lead to a landing and then the staircase turns in the other direction with approximately 6 stairs to the second floor. As one comes up the stairs to the second floor, one faces the front of the building and can look out the window that is located over the front door. As one faces the front of the building looking out the hallway window, the door to apartment 2R **(Target Location 1)** is located on the left wall near the front of the building, approximately 1 ½ feet away from and perpendicular to the second floor hallway window. The door to **Target Location 1** is brown and has no markings on it. On the right wall, as one faces the front of the building looking out the hallway window, is a door leading to another apartment located on the left side of the building, and on the back wall there is a door that is padlocked and is believed to lead to the attic.

42.     PENA is believed to be presently residing at 7 Knight Street, Apartment 2R (Target Location 1). During the course of this investigation, EDUARDO, PENA and CUBA have been seen repeatedly coming and going from the building located at 7 Knight Street. On July 11, 2004, EDUARDO and PENA were seen carrying a suitcase into the front door of 7 Knight Street, which suitcase is believed to have contained cocaine. On August 28, 2004, PENA was observed

32

on the surveillance camera carrying two suitcases and other large bags into the front door of 7

Knight Street, which suitcases are believed to have contained approximately 80 kilograms of

cocaine.

43.      On several occasions, during evening and nighttime surveillance, agents have observed

PENA enter 7 Knight Street and then seconds later, have observed the lights go on inside

apartment 2R. Most recently, on the night of October 3, 3004, I observed CUBA arrive at 7

Knight Street and enter the front door of the building. Through the front windows on the Second

Floor, I thereafter saw PENA inside **Target Location 1**. I then saw both PENA and CUBA,

through these same windows, inside of **Target Location 1**

44.      Telephone number 617-361-9894 is a hard line telephone which is subscribed to by

Richard PENA and which records of Verizon identify is located at 8 Knight Street, Floor 2 Right,

Hyde Park, MA. Investigation has revealed, however, that 8 Knight Street is only a two family

building and the utility records for the apartments at 8 Knight Street are in the names of two

elderly individuals who records show own the units. As stated above, investigation of 7 Knight

Street revealed that apartments in this building are identified by the number of the floor followed

by "L" or "R" indicating the side of the building on which the apartment is located, "left" or

"right." Thus, telephone records identifying the location of the hard line subscribed to by

Richard PENA as an apartment identified as "Floor 2 Right" are more consistent with an

apartment located in 7 Knight Street than in 8 Knight Street. The telephone records are thus

believed to be incorrect in their identification of PENA's hard line at 8 Knight Street.

45.      PENA and CUBA have used this hard line telephone, identified by number 617-361-

9894, to communicate with PINALES and calls have been intercepted while they were using this

33

04722

telephone. Recently on September 19 and on September 26, 2004, CUBA called PINALES from this hard line. To confirm the location of the apartment within 7 Knight Street that has been and continues to be utilized by PENA and CUBA, on September 29, 2004, agents conducted surveillance of the inside of 7 Knight Street. While inside the building, TFA Garvey stood outside the apartment door of **Target Location 1** described above while I placed a call to 617-361-9894, the number assigned to the hard line subscribed to by PENA. TFA Garvey and I were in communication by means of Nextel radio. At the exact time I placed a call to this hard line number, TFA Garvey heard the phone ring inside **Target Location 1**.

**Target Location 2**

46.     **Target Location 2** is an apartment located on Floor 2 at 115 Navarre Street, Hyde Park, Massachusetts. **Target Location 2** is believed to be occupied by CUBA. During the course of this investigation, agents have observed CUBA repeatedly coming and going from 115 Navarre Street in Hyde Park. 115 Navarre Street is a three-family house. Intercepted calls between PINALES and CUBA regarding a meeting between them to organize money for CUBA to deliver the following day to New York revealed that CUBA occupies the Second Floor at 115 Navarre Street:

> On September 19, 2004, at approximately 2:26 p.m., an outgoing call was placed on TARGET CELLPHONE 4 to 617-331-7221. PINALES spoke to CUBA. PINALES told CUBA that he was going to the store and CUBA said he was going home. CUBA told him to follow him, but PINALES said no because he wanted to get the ones who are there and give it to him now so he can leave early. PINALES said that the Puerto Rican is not there yet. CUBA said that he needs to find Richard's phone number. PINALES said that he had to wait for HIPOLITO'S guy at the store and that he sent 10. CUBA told PINALES to come by "here" and said it was on Navarre Street, 115. PINALES agreed.

> On September 19, 2004, at approximately 2:56 p.m., an outgoing call was placed on TARGET CELLPHONE 4 to 617-331-7221. PINALES spoke to CUBA. PINALES said that he was on his way right now.

34

On September 19, 2004, at approximately 4:03 p.m., an incoming call was received on TARGET CELLPHONE 4 from 617-331-7221. PINALES spoke to CUBA. PINALES asked CUBA if he was there yet and CUBA said yes. PINALES said he was on his way down.

On September 19, 2004, at approximately 4:15 p.m., an outgoing call was placed on TARGET CELLPHONE 4 to 617-331-7221. PINALES spoke to CUBA. PINALES asked what floor he was on and CUBA said the second.

**Target Location 3**

47.    **Target Location 3** is the building located at 631 Hyde Park Avenue in Hyde Park, Massachusetts identified by a green sign affixed across the front of the building stating "Supermercado" and a green awning affixed to the building stating "Park Ave. Market," at which location the business known as the Park Avenue Market operates. Manuel PINALES is the owner and operator of the food market doing business as the "Park Avenue Market" at **Target Location 3**. The building located at 631 Hyde Park Avenue is owned by Jae Lee and PINALES is believed to lease it. During the course of this investigation, agents have observed PINALES coming and going from **Target Location 3** on numerous occasions and have observed him inside the store operating the business. Agents have also observed PENA, EDUARDO and CUBA coming and going from **Target Location 3** and have observed CUBA inside the store with PINALES on at least one occasion.

**Target Location 4**

48.    **Target Location 4** is the residence located at 1828 River Street in Hyde Park, Massachusetts. 1828 River Street is one half of a building that contains two units, which are identified as 1828 River Street and 1830 River Street. Facing the front of this building, the unit identified as 1828 River Street is on the left side of the building and the door to this unit is on the left. PINALES owns and resides at 1828 River Street.

35

## USE OF TARGET LOCATIONS

### Target Location 1 - 7 Knight Street, Apartment 2R

49.    As discussed above in the previous paragraphs, intercepted calls and surveillance indicate that **Target Location 1** is actively being used as a stash house and a place to process narcotics. As discussed in paragraphs 11-13, intercepted calls and surveillance show that on July 11, 2004, the PINALES organization received a delivery of cocaine that was brought by EDUARDO to **Target Location 1** where EDUARDO met PENA and thereafter processed the cocaine.

50.    Similarly, as discussed in paragraphs 18-20 above, information received and surveillance video recorded of PENA, indicate that PINALES accepted a delivery of cocaine from OSCAR which PENA carried into 7 Knight Street **(Target location 1)** in suitcases on August 28, 2004.

51.    Moreover, as discussed above in paragraphs 29-31, on September 1, 2004, a Hispanic male was recorded by the surveillance camera arriving at 7 Knight Street in the Ford Explorer and leaving minutes later with a white bag. Thereafter, the Ford Explorer was parked at 107 Durnell Avenue when a Hispanic male was seen meeting with JUSTINIANO prior to JUSTINIANO being stopped by police and a kilogram of cocaine found in the car he was in.

52.    Most recently, as discussed in paragraph 28 above, on October 6, 2004, an intercepted call between PENA and CUBA revealed that they both store and process cocaine at their residences. In PENA's case, that location is 7 Knight Street, Apartment 2R **(Target Location 1)**.

53.    Finally, numerous intercepted calls have showed that PENA collects money from customers in payment for cocaine they receive on credit. For example:

On July 6, 2004, at approximately 6:55 p.m., an incoming call was received on TARGET
CELLPHONE 2 from TARGET CELLPHONE 3. PENA spoke to EDUARDO.

04725

EDUARDO asked PENA what they gave him and PENA answered "Fifty-nine (59)."
EDUARDO said "Fifty-nine? ... Oh no, well, that's fine .... Pass by Manuel's later on
then." PENA agreed. I believe that this call refers to PENA's collection of money for
EDUARDO, that PENA picked up fifty-nine, which is likely $5,900, and that
EDUARDO is a little upset because he wanted it to be more.
**OPINION: I believe that "59" in this call means $5,900 that PENA collected from a
customer in payment for cocaine. I believe EDUARDO's instruction for PENA to
pass by Manuel's was a direction for PENA to bring the money to PINALES.**

On July 7, 2004, at approximately 9:39 a.m., an outgoing call was placed on TARGET
CELLPHONE 1 to TARGET CELLPHONE 2. PINALES spoke to PENA. PINALES
told PENA to go to HIPOLITO'S and pick up the "tickets", a "baina."
**OPINION: I believe that the terms "tickets" and "baina" refer to the money that
HIPOLITO has for PINALES in payment for cocaine. I believe that this call shows
that PENA collects drug proceeds on behalf of PINALES.**

On July 8, 2004, at approximately 11:39 a.m., an outgoing call was placed on TARGET
CELLPHONE 2 to TARGET CELLPHONE 1. PINALES spoke to PENA. PINALES
asked PENA if he went to see HIPOLITO and PENA said he did. PENA asked if he
should "give all the papers together to this guy when he comes?" PINALES asked how
many are HIPOLITO's and PENA said ten (10). PENA said "they are big, the way you
want them."
**OPINION: I believe that the term "papers" refers to money that PENA has
collected, including money from HIPOLITO. I believe the reference to them being
"big" means they are large bills, like $50.00 or $100.00 bills. The reference to
HIPOLITO'S being "ten (10)" is likely a reference to $10,000.**

Accordingly, given that PENA collects cash drug proceeds, there is probable cause that he stores

this money where he lives, at 7 Knight Street, Apartment 2R **(Target Location 1)**.

**Target Location 2 - 115 Navarre Street, Floor 2**

54.    As discussed above in the previous paragraphs, intercepted calls and surveillance indicate

that **Target Location 2** is actively being used by CUBA to store and process cocaine. On

September 12, 2004, at approximately 6:00 p.m., by means of a surveillance camera located at 7

Knight Street, Hyde Park **(Target Location 1)** agents observed a Hispanic male enter 7 Knight

Street carrying a suitcase. Thereafter, agents proceeded to the location of 7 Knight Street and

observed a Hispanic male exit 7 Knight Street with a suitcase and load the suitcase into the back

37

of the Ford Explorer registered to PENA. Agents thereafter followed the Ford Explorer driven by this Hispanic male to 115 Navarre Street (**Target Location 2**) and saw the male extend the handle of the suitcase and pull it up the stairs and into 115 Navarre Street. I believe that this individual was CUBA and that he transported a supply of cocaine to **Target Location 2** where he is presently residing to facilitate distribution of the cocaine.

55.     As discussed in detail above in paragraphs 32-35, on September 27, 2004, when CUBA met with WHITE and is believed to have distributed a kilogram of cocaine to WHITE, which was later recovered, CUBA left WHITE after their initial meeting, traveled to **Target Location 2** and then returned to meet with WHITE, at which time CUBA placed a tan bag into the trunk of WHITE's car. The tan bag later recovered by agents from the woods where WHITE was followed contained a kilogram of cocaine. Accordingly, I believe that CUBA is using **Target Location 2** to store cocaine.

56.     Similarly, as discussed in detail in paragraphs 36-39, on September 29, 2004, when CUBA met with HERNANDEZ, who was later arrested and found in possession of a kilogram of cocaine, CUBA traveled to **Target Location 2** after initially meeting with HERNANDEZ outside **Target Location 3**, the Park Avenue Market. After observing CUBA meet with HERNANDEZ, agents saw CUBA leave HERNANDEZ and walk to **Target Location 2**. When CUBA exited **Target Location 2**, he appeared to be carrying something inside his jacket which was zipped up. CUBA was then observed to return to HERNANDEZ's vehicle and enter it. When CUBA exited the vehicle, his jacket was unzippered and he no longer appeared to be carrying anything. HERNANDEZ was thereafter stopped and arrested after being found in possession of a kilogram of cocaine. Accordingly, I believe that CUBA is using **Target**

38

**Location 2** to store cocaine.

57.    Most recently, as discussed in paragraph 28 above, on October 6, 2004, an intercepted

call between PENA and CUBA revealed that they both store and process cocaine at their

residences. In CUBA's case, that location is 115 Navarre Street, Floor 2 **(Target Location 2)**.

58.    Additionally, based upon intercepted calls, I believe that CUBA is involved in delivering

cocaine as well as collecting money in payment for cocaine distributed to customers on credit and

that he is also involved in transporting money to PABLO in New York in payment for the

cocaine received by the PINALES organization. Calls intercepted on September 19, 2004, the

day before CUBA traveled to New York to deliver money, show that CUBA keeps cash proceeds

from the sale of cocaine at **Target Location 2** and that **Target Location 2** has been used by

PINALES and CUBA to organize large amounts of money before it is delivered to New York:

> On September 19, 2004, at approximately 11:02 a.m., an outgoing call was placed on
> TARGET CELLPHONE 4 to 617-331-7221. PINALES spoke to CUBA. CUBA told
> PINALES that Moreno came with a "piece of shit ... with 30 pesos." CUBA said that he
> left the machine there in the drawer and PINALES asked "did this asshole see you when
> you went in?" CUBA said he did, but said it did not matter. CUBA said that the amount
> of one dollar bills that PINALES had there was huge and told him to just run it through
> the cylinder. PINALES told CUBA to tell him what there is. CUBA asked PINALES to
> come by and PINALES said he would come by to organize that. CUBA said "you already
> know where that is, 115." PINALES told CUBA "to go over there to put that together
> with that" and CUBA refused saying it was better if PINALES came over there so it does
> not go out. PINALES asked CUBA if he wanted to go early and CUBA said he did.
> PINALES said "but the Puerto Rican was gonna go in today" and CUBA said that he told
> him to go by at around 5:00. PINALES then said to wait for that to go in to organize
> everything. CUBA said the Puerto Rican's was "7 or 8 or 10" and he would take care of
> that himself. PINALES said that he wanted to organize it the way he took it, the way
> PINALES gave it to him, so that they do not bother him anymore. CUBA said he had
> tape there too and told PINALES to come over and fix it and that way he did "not have to
> take those papers to ...." PINALES said he would call when he was going over there.
> **OPINION: I believe that this call relates to PINALES and CUBA organizing the
> money for delivery to New York the following day. I believe that this call shows that
> CUBA is stores a large amount of money constituting drug proceeds at 115 Navarre
> Street (Target Location 2) because he is encouraging PINALES to come to his**

39

location to avoid taking the "papers," meaning money, out. The calls also shows that CUBA collects money from cocaine customers. For example, CUBA's reference to Moreno coming with "30" is I believe, a reference to $3,000. Also, CUBA's reference to the Puerto Rican's being "7 or 8 or 10" is a reference to the money that they are waiting to collect from this customer, in my opinion meaning $7,000, $8,000 or $10,000. CUBA's reference to having "tape" there refers, I believe, to tape that they would use to wrap the money after it was organized for delivery to New York.

59.    In addition to showing the use of **Target Location 2** for the storage of cash proceeds, this call also shows that PINALES uses the Park Avenue Market **(Target Location 3)** for his cocaine business. In the above call, CUBA's reference to leaving "the machine" there in the drawer means, I believe, that he left a money counting machine for PINALES at the store; CUBA tells PINALES to use it to run the $1.00 bills through the cylinder.

**Target Location 3 - The Park Avenue Market**

60.    The Park Avenue Market **(Target Location 3)** is owned and operated by PINALES. On numerous occasions, CUBA, EDUARDO and PENA, who work with PINALES in distributing cocaine, have been observed going into and coming out of the Park Avenue Market. As the following information demonstrates, I believe that PINALES uses this market as a point of operation for his cocaine distribution business.

61.    Calls intercepted indicate that PINALES uses **Target Location 3** to meet with customers or their runners who are delivering money in payment for cocaine and to store the cash proceeds of his cocaine distribution business. For example, the following calls show that PINALES met with a runner sent by HIPOLITO at the store prior to meeting with CUBA at 115 Navarre Avenue to organize the money for delivery to New York and that PINALES stores cash proceeds from the sale of cocaine at the store:

On September 19, 2004, at approximately 11:19 a.m., an outgoing call was placed on TARGET CELLPHONE 4 to 978-996-1774. PINALES spoke to HIPOLITO. PINALES

40

asked HIPOLITO to call the guy and HIPOLITO gave PINALES his number: 978-996-5928.

On September 19, 2004, at approximately 1:06 p.m., an incoming call was received on TARGET CELLPHONE 4 from 978-996-5928. PINALES spoke to FNU LNU. PINALES asked FNU LNU if he was from HIPOLITO and FNU LNU said he was and added that he was in PINALES' area and would call him in half an hour.

On September 19, 2004, at approximately 2:08 p.m., an incoming call was received on TARGET CELLPHONE 4 from 978-996-5928. PINALES spoke to FNU LNU. PINALES said he was on his way to where they always meet and FNU LNU said he also was on his way. **OPINION: I believe this call relates to the delivery of money to PINALES by the runner sent by HIPOLITO.**

On September 19, 2004, at approximately 2:26 p.m., an outgoing call was placed on TARGET CELLPHONE 4 to 617-331-7221. PINALES spoke to CUBA. PINALES told CUBA that he was going to the store and CUBA said he was going home. CUBA told him to follow him, but PINALES said no because he wanted to get the ones who are there and give it to him now so he can leave early. PINALES said that the Puerto Rican is not there yet. PINALES said that he had to wait for HIPOLITO'S guy at the store and that he sent 10. CUBA told PINALES to come by "here" and said it was on Navarre Street, 115. PINALES agreed. (Emphasis added).
**OPINION: I believe that this call shows that PINALES is meeting HIPOLITO's runner at the store, meaning the Park Ave Market, to collect money. I also believe that it shows that PINALES stores proceeds from the sale of cocaine at the store because he tells CUBA that he "wants to get the ones who are there" to give it to CUBA who is leaving early the next morning to deliver money to New York.**

On September 19, 2004, at approximately 2:49 p.m., an outgoing call was placed on TARGET CELLPHONE 4 to 978-996-1774. PINALES spoke to HIPOLITO. PINALES told HIPOLITO that he got $9,900 and that $100 are missing. HIPOLITO said he would call and see what happened. PINALES said that the guy took the $100 and HIPOLITO said he would send it. PINALES said that the problem was that this guy was stealing and he doesn't understand why.
**OPINION: Is believe this call refers to the delivery of money to PINALES by HIPOLITO's runner and shows that $9,900 was delivered in payment for cocaine and that it was $100 short.**

On September 19, 2004, at approximately 2:56 p.m., an outgoing call was placed on TARGET CELLPHONE 4 to 617-331-7221. PINALES spoke to CUBA. PINALES said that he was on his way right now.

41

62.    Moreover, intercepted calls also revealed that PINALES had a money remittance service

in the Park Ave Market and used this service to wire money to CUBA, his coconspirator, in the

Dominican Republic:

> On July 3, 2004, at approximately 10:58 a.m., an incoming call was received on
> TARGET CELLPHONE 1 from CUBA. PINALES and CUBA discussed EDUARDO
> and money. PINALES told CUBA that "he did a strange thing to me yesterday (in these
> days). A hundred and thirty-eight (138) were going down south and Primo called me
> because he thought I was setting him up. And he gave him 144.... I asked him about it
> later on and he said 'No, there were 6 extra in there and I made a mistake.'... he was
> giving away an extra 6 pesos. I'm sure he called me back to confirm because he thought I
> was trying to set him up. An extra six (6) pesos. This guy is stupid. I'm doing things
> just like when you were here; you take care of things over there and I'll take care of
> things over here." CUBA then told PINALES to call him and stay on him and about not
> being able to get anything until the problem is solved. PINALES said they should tell
> him to go to hell already. PINALES then said he would send CUBA 1,000 pesos and
> they discussed different names that PINALES should send it to. They discussed the
> exchange rate and that 1,000 would equal "44,750 over there." PINALES said that the
> transfer went through.
> **OPINION: I believe that in the first part of the conversation, they are talking about
> EDUARDO not collecting the money. In this context, PINALES tells CUBA about
> an occasion when EDUARDO really messed up. I believe that the reference to
> bringing "138 ... down south" is a reference to EDUARDO bringing $138,000 down
> to New York as payment for cocaine. Instead of paying the $138,000, however,
> EDUARDO made a mistake and paid $144,000, which was $6,000 too much. I
> believe that this call shows and confirms that EDUARDO is the runner of the money
> to New York. Also, I believe that in the second part of the conversation, PINALES
> wires $1,000 to CUBA in the Dominican Republic and the transfer occurs while they
> are on the phone, showing that PINALES is using the money transmitter services in
> his grocery store to launder money and is structuring the transactions using
> different names.**

Accordingly, as this call shows, PINALES is using **Target Location 3** and his money remittance

business to launder proceeds from his cocaine distribution business and there is probable cause to

believe that records regarding these transactions and the location of such proceeds are kept at the

store (**Target Location 3**).

63.    Intercepted calls also showed that PINALES kept an accounting of the debts owed by his

04731

customers for cocaine received on credit, as well as an accounting of the money collected by the

other members of his cocaine organization and owed to PINALES. For example, in the

following call, PINALES reviewed CUBA's account with him:

> On July 1, 2004, at approximately 5:55 p.m., an incoming call was received on TARGET
> CELLPHONE 1 from 809-257-2330, a telephone number in the Dominican Republic.
> PINALES spoke to an unidentified male, identified in later calls as CUBA. PINALES
> told CUBA that he is working like crazy. CUBA then told PINALES that "Eduardo
> should have given you 30 with 400." PINALES then said "Let me check your account. It
> is right here. When you left you owed me forty-one-two-fifty (41,250) and he brought
> eight (8), then seven (7) and then he brought fifty-six (56). Manolo gave me a thousand
> and two hundred and nine (9). How much did he tell you that he had to give?" CUBA
> answered "Thirty-Two (32). PINALES said "Yeah, something like that.... right now you
> owe eleven-fifty (1150)." Later in the conversation, PINALES told CUBA "It would be
> best if you could pick up the package . . . so that you leave right away." CUBA told
> PINALES to send him a small package . . . like ten (10) or twelve (12)." PINALES
> laughed and replied "Really? One must work hard and start collecting. Everybody is
> falling behind. I have to talk to "Cabeza de Marano" (Log head) to find out how he is
> doing." CUBA said that "he doesn't call man" and PINALES said "That faggot. I'm
> going to tell him. Since you left it hasn't been the same." CUBA then asked PINALES
> when he was coming and PINALES said the twenty-second (22nd). CUBA said he is
> opening a Night Club. Later, CUBA told PINALES to send something to the "Viejo"
> (Old man) and PINALES responded that "we are collecting now over there and trying to
> close this account." CUBA told him that when he is done to send something to the
> "Viejito" (Old Man) over here. PINALES then asked CUBA what he agreed with
> "Narizudo" (Big Nose) and CUBA told PINALES to "pay that son of a bitch." PINALES
> objected, saying that he had already said he had taken it from mine. CUBA said to "give
> him seventy-five (75)" and PINALES said "No, he took 100 that were mine." CUBA
> said he doesn't care if he took from PINALES', that he owed him seventy-five (75).
> PINALES told CUBA to fix his own problem with him. The call ends with CUBA
> telling PINALES to send something to the "Viejo" (Old man).
>
> **OPINION: I believe that this call refers to the accounting of drug proceeds and
> debts between PINALES and CUBA. In the beginning of the call, CUBA is
> confirming that PINALES received money from him and PINALES then goes
> through the payments he has received on CUBA's account and what he still owes.
> In my opinion, this accounting relates to money CUBA owes PINALES that he
> collected from customers in payment for cocaine. I believe that when CUBA asks
> PINALES to send him a package, the reference to package refers to money and that
> PINALES then tells CUBA they are having trouble collecting, which in my opinion
> refers to the collection of money owed for cocaine. In this context, PINALES refers
> to checking with Log Head, which may be a reference to EDUARDO, regarding how
> he is doing collecting money. I believe the reference to Big Nose owing money is also**

43

04732

a reference to a drug debt and that Big Nose may have deducted money owed by CUBA from money he owed to PINALES. Finally, there is reference to PINALES going to the Dominican Republic on July 22. In my opinion, this call shows that PINALES and CUBA are in the cocaine distribution business together.

At the time of this call, cell site information revealed that PINALES was located in the vicinity of the Park Avenue Market **(Target Location 3)**, most likely at the Market, when the call was made. Similarly, the following call shows that he encouraged the members of his organization to keep an accounting of the money collected and to be delivered to New York:

> On July 10, 2004, at approximately 5:47 p.m., an incoming call was received on TARGET CELLPHONE 1 from 646-519-9415, a number with an unknown subscriber. PINALES spoke to CUBA. PINALES told him that the "O" had called and that "they're coming here and I'm calling him over there to see if we can straighten out the number... because Primo has already called me saying that he will be coming here tomorrow." CUBA told PINALES to "tell him to come at 21" and PINALES said "if he comes in at 22, we could do something." They then discussed EDUARDO and his problem with money and PINALES said "When there's a collection, I write it down for him and then when we're going to deliver: 'Look you should have this much over there.' Isn't that how I used to do it with you?"
> **OPINION: I believe the reference to EDUARDO and writing the numbers down shows that PINALES keeps an accounting of money collected in payment for cocaine and money to be delivered to New York.**

### Target Location 4 - PINALES' residence at 1828 River Street

64.     **Target Location 4** is the residence of PINALES, the leader of this cocaine trafficking organization. As demonstrated by intercepted calls detailed above, PINALES maintains written accountings or ledgers of the amounts of money owed by customers, collected by members of his organization, and delivered to New York in payment for his own debt for cocaine he received.

65.     Based upon my training and experience, I am aware that drug traffickers keep books, records, receipts, notes, ledgers, and computer records related to the transportation, ordering, sale and distribution of controlled substances, as well as the location of drug proceeds, at their residences. Accordingly, I believe that there is probable cause to believe that PINALES has and

maintains such records of his cocaine distribution business and the proceeds derived from cocaine distribution at his residence.

## Use of Residences by Narcotics Traffickers

66.     Also, based on my training and experience, I am personally aware that the items enumerated below are frequently located during searches of drug traffickers' residences:

    a.    that narcotics traffickers and money launderers maintain on hand large amounts of United States currency in order to maintain and finance their on-going drug business;

    b.    that narcotics traffickers and money launderers maintain books, records, receipts, notes, ledgers, floppy discs, and other records stored in computers, airline tickets, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That narcotics traffickers commonly "front" (i.e., provide on consignment) drugs to their clients. That the aforementioned books, records, receipts, notes , ledgers, etc., are maintained where the traffickers and launderers have ready access to them;

    c.    that it is common for drug dealers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within houses for ready access and to conceal them from law enforcement authorities;

    d.    that when drug traffickers amass large amounts of proceeds from the sale of drugs, the drug traffickers often attempt to legitimize these profits. In order to accomplish this, drug traffickers utilize domestic and foreign banks and/or financial institutions, brokerage houses, real estate, shell corporations, business

45

fronts, and their attendant services in the transfer of securities, cashier's checks, money drafts, property titles and letters of credit;

e.    that it is common practice for narcotics traffickers to travel to their purchase and distribution areas to facilitate their trafficking. That after purchasing drugs, these traffickers will transport drugs or cause drugs to be transported to areas in which they will distribute the drugs. That the methods of transportation include commercial airlines, private airplanes and ocean going motor vessels, yachts, rental and private automobiles;

f.    that narcotics traffickers and money launderers commonly maintain addresses and/or telephone numbers in books or papers which reflect points of contact of their associates in the trafficking; and that such records are frequently kept within ready access when traffickers travel in furtherance of their drug transactions;

g.    that drug traffickers take or cause to be taken photographs of themselves, their associates, their property and their product. That these traffickers usually maintain these photographs on their property or at stash locations for their drugs; and,

h.    that based on my training and experience, drug traffickers commonly have in their possession, that is, on their person, at their residences, business premises and/or their stash locations, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons. Said firearms are used to protect and secure a drug trafficker's property, such as narcotics, jewelry,

46

narcotics paraphernalia, books, records and United States currency, and said

firearms are often readily available in houses or stash locations concealing

narcotics.

_____
JOSEPH GALLARELLI
TASK FORCE AGENT
DRUG ENFORCEMENT ADMINISTRATION

**SUBSCRIBED and SWORN**
by me this 8 day of October , 2003.

Time: 11:05 AM

_____
MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

47

04736

AO 106 (Rev. 7/87) Affidavit for Search Warrant

# United States District Court

_____ **DISTRICT OF** _____ MASSACHUSETTS _____

| | |
|---|---|
| **In the Matter of the Search of** <br> (Name, address or brief description of person, property or premises to be searched) <br><br> 7 Knight Street <br> Apartment 2R <br> Hyde Park, MA | **APPLICATION AND AFFIDAVIT** <br> **FOR SEARCH WARRANT** <br><br> CASE NUMBER: 04 CR 10314 RCL-C |

I _____ Joseph Gallarelli _____ being duly sworn depose and say:

I am a(n) _____ DEA Task Force Agent _____ and have reason to believe
Official Title

that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)

See Attachment A, attached hereto and incorporated herein

in the _____ District of _____ Massachusetts _____

there is now concealed a certain person or property, namely (describe the person or property to be seized)

those items described in Attachment B, attached hereto and incorporated herein

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)
evidence of Conspiracy to Possess With Intent to Distribute and to Distribute Cocaine

concerning a violation of Title _____ 21 _____ United States code, Section(s) _____ 846 _____
The facts to support a finding of Probable Cause are as follows:

See Attached Affidavit of Task Force Agent Joseph Gallarelli, attached hereto and incorprated herein.

Continued on the attached sheet and made a part hereof.    ☒ Yes    ☐ No

_____
Signature of Affiant

Sworn to before me, and subscribed in my presence

October 8, 2004 @ 11:35AM    at    Boston, Massachusetts
Date                                                    City and State

Marianne B. Bowler, United States Magistrate Judge    _____
Name and Title of Judicial Officer                     Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

04514

# ATTACHMENT A

Target Location 1 is 7 Knight Street, Apartment 2R, Hyde Park, Massachusetts, which is the apartment located on the Second Floor at 7 Knight Street on the right side of the building as one stands facing the front of the building. Target Location 1 is located within a two story yellow wooden structure identified as 7 Knight Street (See attached photograph).

The front door is located on Knight Street in the center of the building. The number "7" is located on the front door. On the second floor directly above the front door is a window that is located in the common hallway. The two windows on the second floor to the right of the hallway window, as one stands facing the front of the building, are the windows of Target Location 1. The front door enters onto a common hallway on the first floor. On the first floor, there are two doors, one on the right and one on the left, which are believed to lead to apartments on either side of the building. A staircase leads to the second floor. As one enters the front door of the building, one faces the staircase. Approximately 6 stairs lead to a landing and then the staircase turns in the other direction with approximately 6 stairs to the second floor. As one comes up the stairs to the second floor, one faces the front of the building and can look out the window that is located over the front door. As one stands inside facing the front of the building and looking out the hallway window, the door to apartment 2R (Target Location 1) is located on the left wall near the front of the building, approximately 1 ½ feet away from and perpendicular to the second floor hallway window. The door to Target Location 1 is brown and has no markings on it.



## ·ATTACHMENT B

1.    controlled substances, including cocaine and/or heroin;

2.    paraphernalia for the packaging, processing and distribution of controlled
       substances such as cocaine and/or heroin, to include plastic bags and seals, scales,
       "cutting" agents used to dilute/extend heroin/cocaine prior to sale, and electronic
       pagers and cellular telephones used to communicate with drug associates;

3.    Books, records, notes, ledgers, and any other papers or records
       relating to the purchase, transportation, shipment, ordering, sale,
       importation, manufacture, and/or distribution of controlled
       substances and/or records relating to the receipt, disposition, and/or
       laundering of proceeds from the distribution of controlled
       substances, such as cocaine and/or heroin, and/or records or
       electronic devices reflecting the identity of co-conspirators and
       drug customers, as well as their addresses, telephone, and pager
       numbers.  Such documents include, but are not limited to,
       telephone address books, planners, receipts, state and federal
       income tax returns and supporting paperwork, notes, ledgers, bank
       records, money orders, wire transfers, cashier's checks, passbooks,
       certificates of deposit, bills, vehicle rental receipts, credit card
       receipts, hotel receipts, meal receipts, travel agency vouchers,
       travel schedules, shipment records, telephone bills and/or toll
       records and bills.

4.    Cash and currency, and other items of value made or derived from
       trafficking in illegal substances, documents related thereto, and/or
       objects used to conceal said proceeds.  Such items include, but are
       not limited to jewelry, precious metals, titles of real property,
       deeds, bank records, safes, safe deposit boxes and/or safe deposit
       box keys or any other papers concerning financial transactions
       relating to obtaining, transferring, laundering, concealing, or
       expending money or other items of value made or derived from
       trafficking in illegal substances.

5.    Documents reflecting dominion and/or control of 7 Knight Street,
       Apartment 2R, Hyde Park, Massachusetts, including, but not
       limited to, canceled mail, photographs, personal telephone books,
       diaries, bills and statements, videotapes, keys, identification cards
       and documents.

6.    Documents or tangible evidence reflecting dominion, ownership,

-2-

04517

and/or control by Richard PENA, Luis CLAS, or Jose Antonio CRUZ over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

7.    Photographs of individuals, property, and/or illegal controlled substances.

8.    Firearms, including ammunition, magazines, holsters, and any components of firearms, which are kept for the protection of said controlled substances or proceeds.

04518

AO 106 (Rev. 7/87) Affidavit for Search Warrant

# United States District Court

_____ **DISTRICT OF** ___MASSACHUSETTS___

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

115 Navarre Street
Floor 2
Hyde Park, MA

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT

CASE NUMBER: 04 CR 10314 RCL—

I _____ Joseph Gallarelli _____ being duly sworn depose and say:

I am a(n) _____ DEA Task Force Agent _____ and have reason to believe
Official Title

that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)

See Attachment A, attached hereto and incorporated herein

in the _____ District of _____ Massachusetts _____

there is now concealed a certain person or property, namely (describe the person or property to be seized)
those items described in Attachment B, attached hereto and incorporated herein

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)
evidence of Conspiracy to Possess With Intent to Distribute and to Distribute Cocaine

concerning a violation of Title _____ 21 _____ United States code, Section(s) _____ 846 _____ .
The facts to support a finding of Probable Cause are as follows:

See Attached Affidavit of Task Force Agent Joseph Gallarelli, attached hereto and incorprated herein.

Continued on the attached sheet and made a part hereof.    ☒ Yes    ☐ No

Signature of Affiant

Sworn to before me, and subscribed in my presence

October 8, 2004 @ 11:05AM    at    Boston, Massachusetts
Date                                                City and State

Marianne B. Bowler, United States Magistrate Judge    Marianne B. Bowler, USMJ
Name and Title of Judicial Officer                         Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

04573

## **ATTACHMENT A**

Target Location 2 is an apartment located on Floor 2 at 115 Navarre Street, Hyde Park, Massachusetts. Target Location 2 is located within a three-family grey and white wooden structure (See attached photograph). The front door is located in the center of the building off of a front porch. The number "115" is located on the post of the front porch. Target Location 2 is on the second floor.



## ATTACHMENT B

1.  controlled substances, including cocaine and/or heroin;

2.  paraphernalia for the packaging, processing and distribution of controlled
    substances such as cocaine and/or heroin, to include plastic bags and seals, scales,
    "cutting" agents used to dilute/extend heroin/cocaine prior to sale, and electronic
    pagers and cellular telephones used to communicate with drug associates;

3.  Books, records, notes, ledgers, and any other papers or records
    relating to the purchase, transportation, shipment, ordering, sale,
    importation, manufacture, and/or distribution of controlled
    substances and/or records relating to the receipt, disposition, and/or
    laundering of proceeds from the distribution of controlled
    substances, such as cocaine and/or heroin, and/or records or
    electronic devices reflecting the identity of co-conspirators and
    drug customers, as well as their addresses, telephone, and pager
    numbers. Such documents include, but are not limited to,
    telephone address books, planners, receipts, state and federal
    income tax returns and supporting paperwork, notes, ledgers, bank
    records, money orders, wire transfers, cashier's checks, passbooks,
    certificates of deposit, bills, vehicle rental receipts, credit card
    receipts, hotel receipts, meal receipts, travel agency vouchers,
    travel schedules, shipment records, telephone bills and/or toll
    records and bills.

4.  Cash and currency, and other items of value made or derived from
    trafficking in illegal substances, documents related thereto, and/or
    objects used to conceal said proceeds. Such items include, but are
    not limited to jewelry, precious metals, titles of real property,
    deeds, bank records, safes, safe deposit boxes and/or safe deposit
    box keys or any other papers concerning financial transactions
    relating to obtaining, transferring, laundering, concealing, or
    expending money or other items of value made or derived from
    trafficking in illegal substances.

5.  Documents reflecting dominion and/or control of 115 Navarre
    Street, Floor 2, Hyde Park, Massachusetts, including, but not
    limited to, canceled mail, photographs, personal telephone books,
    diaries, bills and statements, videotapes, keys, identification cards
    and documents.

6.  Documents or tangible evidence reflecting dominion, ownership,

-4-

and/or control by Luis CLAS over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

7.     Photographs of individuals, property, and/or illegal controlled substances.

8.     Firearms, including ammunition, magazines, holsters, and any components of firearms, which are kept for the protection of said controlled substances or proceeds

04577

# UNITED STATES DISTRICT COURT

_____ DISTRICT OF _____ MASSACHUSETTS _____

### In the Matter of the Search of
(Name, address or brief description of person or property to be searched)

631 Hyde Park Avenue
Hyde Park, MA

## SEARCH WARRANT

CASE NUMBER: 04 CR 10314 RCL- D

TO: _____ Task Force Agent Joseph Gallarelli _____ and any Authorized Officer of the United States

Affidavit(s) having been made before me by _____ Task Force Agent Joseph Gallarelli _____ who has reason to

                                          Affiant

believe that ☐ on the person of or ☒ on the premises known as (name, description and/or location)

See Attachment A, attached hereto and incorporated herein,

in the _____ District of _____ Massachusetts _____ there is now

concealed a certain person or property, namely (describe the person or property)

those items descibed in Attachment B, attached hereto and incporporated herein

I am satisfied that the affidavit(s) and any record testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before _____ 10-13-2004 _____

                                                                    Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the search (in the daytime -- 6:00 A.M. to 10:00 P.M.) (at any time in the day or night as I find reasonable cause has been established) and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to _____ Marianne B. Bowler, United States Magistrate Judge _____

as required by law.                         U.S. Judge or Magistrate Judge

October 8, 2004 @ 11:35 AM            at      Boston, Massachusetts
Date and Time Issued                             City and State

Marianne B. Bowler
United States Magistrate Judge           _Marianne B. Bowler, USMJ_
Name and Title of Judicial Officer          Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

04625

| RETURN | | CASE NUMBER: | 04 CR 10314 RCL |
|---|---|---|---|

| DATE WARRANT RECEIVED | DATE AND TIME WARRANT EXECUTED | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH |
|---|---|---|
| 10 | 08 | 2004 | 10 | 08 | 2004   1605hrs | Amiliar Garcia |

INVENTORY MADE IN THE PRESENCE OF

SA Jean Drouin | SSA Jeff Larocque

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

1) one checkbook with deposit slips
2) money transfer receipts
3) U.S. Currency totaling $6822.00
4) one money counter machine
5) Financial documents
6) Drug Ledgers
7) 1 hewlett Pacard computer
8) one box of money transfer receipts
9) Tax returns
10) Documents  from the office
11) U.S. Currency taken from the person of Manuel PINALES $1749.00
12) Wallet ,papers, ând address book taken from PINALES

## CERTIFICATION

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_(signature)_ 10-20-2004

Subscribed, sworn to, and returned before me this date.

_Marianne B. Bowler USMJ_            _Oct 20, 2004_
U.S. Judge or Magistrate Judge                Date

04626

# ATTACHMENT A

   Target Location 3 is the building located at 631 Hyde Park Avenue in Hyde Park, Massachusetts identified by a green sign affixed across the front of the building stating "Supermercado" and a green awning affixed to the building stating "Park Ave. Market," at which location the business known as the Park Avenue Market operates. (See attached photograph). The number "631" appears on the green awning outside the building.



## ATTACHMENT B

1.    Books, records, notes, ledgers, and any other papers or records relating to the
      purchase, transportation, shipment, ordering, sale, importation, manufacture,
      and/or distribution of controlled substances and/or records relating to the receipt,
      disposition, and/or laundering of proceeds from the distribution of controlled
      substances, such as cocaine and/or heroin, and/or records or electronic devices
      reflecting the identity of co-conspirators and drug customers, as well as their
      addresses, telephone, and pager numbers.  Such documents include, but are not
      limited to, telephone address books, planners, receipts, state and federal income
      tax returns and supporting paperwork, notes, ledgers, bank records, money orders,
      wire transfers, cashier's checks, passbooks, certificates of deposit, bills, vehicle
      rental receipts, credit card receipts, hotel receipts, meal receipts, travel agency
      vouchers, travel schedules, shipment records, telephone bills and/or toll records
      and bills.

2.    Cash and currency, and other items of value made or derived from trafficking in
      illegal substances, documents related thereto, and/or objects used to conceal said
      proceeds.  Such items include, but are not limited to jewelry, precious metals,
      titles of real property, deeds, bank records, safes, safe deposit boxes and/or safe
      deposit box keys or any other papers concerning financial transactions relating to
      obtaining, transferring, laundering, concealing, or expending money or other items
      of value made or derived from trafficking in illegal substances, including records
      of money remittence business.

3.    Documents reflecting dominion and/or control of 631 Hyde Park Avenue, Hyde
      Park, Massachusetts, including, but not limited to, canceled mail, photographs,
      personal telephone books, diaries, bills and statements, videotapes, keys,
      identification cards and documents, airline tickets and related travel documents.

4.    Documents or tangible evidence reflecting dominion, ownership, and/or control
      by Manuel PINALES over any bank accounts, safe deposit boxes, stocks, bonds,
      mutual funds, and any other financial and/or monetary assets, instruments or
      interests, and over any tangible assets such as motor vehicles, real property, and
      commercial storage facilities.

5.    Photographs of individuals, property, and/or illegal controlled substances.

04629