UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.04 CR 10314 RCL |
| | ) | |
| MANUEL E. PINALES | ) | |
| | ) | |
| Defendant | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION TO SUPPRESS EVIDENCE**

The United States of America, by its attorneys, United States Attorney Michael J.

Sullivan, and Assistant U. S. Attorney Maureen B. Hogan, hereby opposes Defendant Manuel E.

Pinales' ("Pinales") Motion to Suppress Evidence seized at his residence pursuant to a warrant.

**BACKGROUND**

Pinales, along with 12 codefendants, is charged in Count One of the First Superseding

Indictment with conspiracy to possess with intent to distribute and to distribute 5 kilograms or

more of cocaine, in violation of 21 U.S.C. §§846, 841.  This First superseding Indictment arose

from a long-term investigation by the Drug Enforcement Administration ("DEA") into the

cocaine trafficking organization lead by Pinales.  The investigation began in March 2004 and

involved the use of a confidential source, consensual recordings, physical surveillance, and court

authorized interception of communications.  On June 29, 2004, August 4, 2004, and September

13, 2004, United States District Judge Joseph L. Tauro, in the District of Massachusetts,

authorized the interception of six cellphones being used by members of the targeted cocaine

trafficking organization, including Manuel Pinales, Jose Eduardo Rodriguez a/k/a Jose Antonio

Crus a/k/a Eduardo ("Eduardo"), Richard Pena ("Pena"), and Rafael Heredia a/k/a Luis Clas

-1-

a/k/a Cuba ("Cuba").  The investigation revealed that these individuals were involved in the distribution of multi-kilograms of cocaine since at least June 2004.  See Affidavit in Support of Search Warrant by Joseph Gallarelli  ("Gallarelli Aff.") ¶10, attached as Exhibit 1.  Pinales was identified as the leader of the cocaine distribution organization and was determined to reside at 1828 River Street, Hyde Park, MA and to be the owner and operator of the Park Avenue Market, located at 631 Hyde Park Avenue in Hyde Park, MA.  Id.  The investigation showed that Pinales received cocaine in quantities of over 20 kilograms at a time, with the last delivery received by the Pinales organization on August 28, 2004 being 80 kilograms of cocaine.  Id.  Through the investigation, agents further learned that Pinales and the members of his organization distributed cocaine to the Boston, New Bedford and Lowell areas of Massachusetts, as well as to Rhode Island.  Id.  The wiretaps revealed that the supplier of the cocaine was an individual referred to as "Oscar" who was located in the Dominican Republic.  Id.  The wiretaps also showed that an individual referred to as "Pablo" worked  for OSCAR and was located in New York City.  Id. Pablo was the individual to whom Eduardo and Cuba on behalf of the Pinales organization delivered money in payment for cocaine that the Pinales organization received on credit.  Id. Pablo was also the individual who delivered the cocaine to the Pinales organization, specifically Eduardo and Pena.  Id.  The operation worked as follows:  Oscar provided large quantities of cocaine to Pinales on credit; Under Pinales' direction, Cuba, Eduardo and Pena distributed the cocaine to customers, many of whom received the cocaine on credit, and then collected money from their customers in payment for the cocaine;  Cuba and Eduardo then delivered money to "Pablo" in New York on a weekly basis, and sometimes in Boston, in payment for the cocaine. Id.  Pinales and the members of his organization worked with their customers in a similar manner:  they distributed kilogram quantities of cocaine to their customers on credit and then,

after their customers in turn sold the cocaine, they collected the money from such customers in payment for the cocaine.  Id.

Based upon the evidence obtained through this investigation, on October 6, 2004, Pinales, along with the other core members of the trafficking organization, was indicted and charged with conspiracy to possess with intent to distribute and to distribute 5 kilograms or more of cocaine.  On October 8, 2004, Pinales and the other members of the organization were arrested.  On October 8, 2004, DEA agents also obtained a federal search warrant, issued by Magistrate Judge Marianne B. Bowler, for 4 locations used by the members of this organization, including the residence of Pinales, 1828 River street, Hyde Park, Massachusetts.  See Search Warrant, Search Warrant Application, and Affidavit in Support of Search Warrant by Joseph Gallarelli  ("Gallarelli Aff.), attached as Exhibit 1.  The other three locations included the residence of codefendant Heredia a/k/a "Cuba" at 115 Navarre Street, Second Floor, Hyde Park, MA; the residence of codefendant Richard Pena at 7 Knight Street, Apartment 2R, Hyde Park, MA; and the business known as the "Park Avenue Market," located at 631 Hyde Park Avenue, Hyde Park, MA, which was owned and operated by Pinales.  On October 8, 2004, pursuant to these search warrants, agents conducted searches of these four locations, including the residence of Pinales at 1828 River Street, Hyde Park.  The search warrant of Pinales' residence authorized agents to search for: (1) cash and currency and other items of value made or derived from trafficking in illegal substances and documents related thereto, including bank records and records of property; (2) records, ledgers and other documents related to the trafficking of controlled substances and the receipt, disposition, and/or laundering of proceeds derived from the distribution of controlled substances; (3) documents reflecting dominion and control of Pinales over bank accounts, safety deposit boxes, stocks, bonds, and any other financial and/or

monetary assets; (4) documents reflecting dominion and/or control of 1828 River Street; and (5) photographs of individuals, property, and illegal controlled substances. During the search of Pinales' residence, agents seized $127,000 in cash, a drug ledger, personal papers including financial and banking information, mortgage papers for properties, and identification and a passport in Pinales' name.[1] See Search Warrant Return (Exhibit 1)

By his motion to suppress, Pinales now challenges the search of his residence, seeking to suppress the items seized, claiming that the Affidavit supporting the warrant failed to demonstrate probable cause to believe that evidence of the crime would be found at the place to be searched – Pinales' residence at 1828 River street, Hyde Park, MA. This Court should reject Pinales' argument because Magistrate Judge Bowler had a "substantial basis" for concluding that the Gallarelli Affidavit demonstrated probable cause to believe that evidence of Pinales' large scale cocaine trafficking activity – namely cash proceeds, drug ledgers, bank records and financial documents showing the location of drug proceeds – would be found at the residence of Pinales, the leader of this cocaine trafficking organization. Pinales' motion to suppress should therefore be denied.

## ARGUMENT

### I.    THERE WAS PROBABLE CAUSE TO BELIEVE THAT EVIDENCE OF

---

[1]   At the residence of Heredia, 115 Navarre Street, Hyde Park, agents seized approximately 54 kilograms of cocaine, $86,200.00 in cash, a kilogram press, drug ledgers, personal papers and a lease for the location in the name of Luis Clas. At Pena's residence, 7 Knight Street, Hyde Park, agents seized approximately 4 kilograms of cocaine and 19 empty kilogram wrappers, in addition to papers in the name of Richard Pena. At Pinales' business, the "Park Avenue Market," agents seized $6,800.00 in cash, drug ledgers, financial documents, tax returns, and a money counter machine.

**PINALES' COCAINE TRAFFICKING WOULD BE FOUND AT HIS
RESIDENCE**

Before issuing a search warrant, a magistrate judge must find probable cause to believe

that the defendant has committed a crime -- "the commission element" -- and that enumerated

evidence relevant to the probable criminality likely is located at the place to be searched -- "the

'nexus' element". United States v. Zayas-Diaz, 95 F.3d 105, 111 (1st Cir. 1996). To satisfy this

"probable cause" standard, the totality of the circumstances disclosed in the supporting affidavit

must demonstrate "a fair probability that contraband or evidence of a crime will be found in a

particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983); United States v. Bucuvalas, 970

F.2d 937, 940 (1st Cir. 1992), cert. denied, 507 U.S. 959 (1993).  As the First Circuit has

repeatedly recognized, "[t]he nexus between the objects to be seized and the premises to be

searched need not, and often will not, rest on direct observation, but rather 'can be inferred from

the type of crime, the nature of the items sought, the extent of an opportunity for concealment,

and normal inferences as to where a criminal would hide [evidence of a crime]....'" United States

v. Feliz, 182 F.3d 82, 88 (1st cir. 1999)(quoting United States v. Charest, 602 F.2d 1015, 1017

(1st Cir. 1979); United States v. Ribeiro, 397 F.3d 43, 49 (1st cir. 2005).

It is well settled that the review of an issuing magistrate judge's probable cause

determination is deferential.  "Reflecting this preference for the warrant process, the traditional

standard for review of an issuing magistrate's probable cause determination has been that so long

as the magistrate had a 'substantial basis . . . conclud[ing]' that a search would uncover evidence

of wrongdoing, the Fourth Amendment requires no more.  Gates, 462 U.S. at 236 (quotation

omitted).  Accordingly, the reviewing court, here the district court, must accord "considerable

deference" to the determination of probable cause by the magistrate judge.  See Zayas-Diaz, 95

F.3d at 111; see also United States v. Taylor, 985 F.2d 2, 5 (1ˢᵗ Cir. 1993). The reviewing court must examine the affidavit in a practical, common sense fashion, and accord considerable deference to reasonable inferences the issuing magistrate may have drawn from the facts presented in the sworn affidavit. Bucuvalas, 970 F.2d at 940; see United States v. Jewell, 60 F.3d 20, 23 (1st Cir. 1995) (citing the totality of the circumstances test and rejecting the defendant's invitation to "engage in a piecemeal examination of the affidavit," and to base review on "bits and pieces of information in isolation"). The inquiry is whether the magistrate judge had a "substantial basis" for concluding that probable cause existed. United States v. Feliz, 182 F.3d 82, 86 (1ˢᵗ Cir. 1999) (quoting Taylor, 985 F.2d at 6); United States. v. Whitner, 219 F.3d 289, 291-92 (3ʳᵈ Cir. 2000) (quoting Gates, 462 U.S. at 238).

Employing a commonsensical approach and giving deference to reasonable inferences the issuing magistrate may have drawn from the facts  presented in the search warrant affidavit, the totality of facts and circumstances presented in the affidavit clearly show that Magistrate Judge Bowler had a substantial basis for finding probable cause to believe that evidence of Pinales' large-scale cocaine trafficking – namely cash proceeds, documents regarding the location of drug proceeds, and records and ledgers of cocaine trafficking activity – would be found at Pinales' residence. As the First Circuit has stated in cases in which it has upheld search warrants authorizing the search of drug traffickers' residences, "one can reasonably infer that such regular, large-scale traffickers would need to keep detailed accounts, customer lists, and money 'in some safe yet accessible place,' i.e., their homes." Ribeiro, 397 F.3d at 49 (citing Feliz, 182 F.3d at 87-88). In Feliz, the First Circuit upheld a warrant to search a drug dealer's residence even though there was no direct evidence that money, client lists and accounting records were stored at the house. The Feliz court held that there was probable cause to believe

that evidence would be found at the defendant's residence where, in addition to the information and opinions offered by an experienced DEA agent, the facts in the affidavit establishing that he was a "long-time successful drug trafficker" supported a reasonable inference that "a regular trafficker like Feliz possessed documents showing the names and telephone numbers of customers and suppliers as well as accounts showing the monies paid and collected" and kept such evidence in a "safe yet accessible place," i.e. his home.  Id; see also Ribeiro, 397 F.3d 43, 49-50;  United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th cir. 1986); United States v. Thomas, 989 F.2d 1252, 1255 (D.C. Cir. 1995); United States v. Williams, 974 F.2d 480, 482 (4th Cir. 1992); United States v. Cruz, 785 F.2d 399, 406 (2d Cir. 1986).

   The facts of this case and the facts included in the Gallarelli affidavit are analogous to those in Feliz, and this Court should therefore follow Feliz and similar precedent and uphold the search warrant for Pinales' residence.  As the Gallarelli Affidavit demonstrates, Pinales was the leader of a cocaine trafficking organization that trafficked cocaine on a far larger scale than the defendants in Feliz and Ribeiro.  Gallarelli Aff. ¶¶10-39.  Pinales, the leader of the organization, dealt directly with the supplier of the cocaine, Oscar, who was located in the Dominican Republic, regarding the quantities of cocaine his organization would receive and the price that he would pay for the cocaine.  Id. at ¶¶11-13, 18.  Pinales also communicated directly with Oscar's worker, Pablo, from New York regarding the delivery of and payment for cocaine, and then would direct his workers Jose Rodriguez a/k/a Eduardo, Richard Pena, and Heredia a/k/a Cuba to pick up the cocaine and to deliver the money in payment for the cocaine.  Id. at ¶¶11-13.  Pinales also directed the members of his organization in the distribution of cocaine and collection of money from customers, and his workers reported back to him regarding cocaine distributed and money collected.  Id. at ¶¶14-17, 32-39, 53.  Pinales set the price per kilogram for each of the

organization's customers and the workers followed his orders. Id. at ¶¶11-17. As demonstrated throughout the affidavit, the workers would repeatedly check with him regarding the distribution of cocaine to customers, as well as the price to be charged. Id. at ¶17. Further, demonstrating his superiority to the other members of his organization, Pinales orchestrated the drug trafficking from a distance, never handling the cocaine himself, and on only one occasion did he collect money sent by a customer. Id. at ¶¶10-39, 69. He dealt with the customers by telephone to accept orders for cocaine and request payment, and he directed the members of his organization to do the dirty work – pick up, store and deliver the cocaine (Id. at ¶¶10-17, 49-57) – although he did help with the important job of organizing the money for delivery to the supplier. Id. at ¶58. Moreover, the affidavit shows that Pinales maintained records of the accounts of his cocaine customers and the members of his organization who serviced them. Id. at ¶¶63-64.

Pinales was the boss, and he trafficked in quantities of over 100 kilograms of cocaine in only two months. On July 10, 2004, he received a delivery of cocaine that based upon subsequent distribution to customers described in the Gallarelli Affidavit, was a quantity of over 28 kilograms, for which he paid Oscar $22,000 per kilogram, a total of $616,000. Id. at ¶¶11-17. On August 20, 2004, Pinales again received a supply of 80 kilograms of cocaine, the price for which was $21,500 per kilogram, for a total price of $1,720,000 that he had to pay Oscar. Id. at ¶¶18-21. The large scale nature of Pinales' trafficking activity is further emphasized by Oscar's statement to him that they were talking about the movement of 600 kilograms. Id. at ¶¶11, p. 9. Pinales' cocaine trafficking generated extremely large sums of money and great profit for him. For example, the price Pinales charged his customers per kilogram was at least $24,000 and higher for some customers. Assuming he sold the 80 kilograms, for which he paid $1,720,000, at $24,000 per kilogram, his profit would be $200,000. Given such a large sum of money, it is

reasonable to infer that Pinales would keep such cash and documents reflecting the disposition of such money, in the safest place, which would be his home. The affidavit further showed the continuing nature of Pinales' trafficking activities because the investigation of his activities began 7 months before his arrest, he received numerous deliveries of large quantities of cocaine, and he had a continuing relationship with the supplier Oscar who had 600 kilograms to move. In sum, given the large scale nature of Pinales' cocaine trafficking activity, his leadership role of the organization, and the fact that he maintained records of his cocaine trafficking activity, amply demonstrated by the facts in the Gallarelli Affidavit, a substantial basis existed for Magistrate Judge Bowler's conclusion that there was probable cause to believe that Pinales would store cash proceeds from the sale of the cocaine, as well as bank records and other documents evidencing the location of such drug proceeds and the details of his trafficking activity, in the safety of his home.

Ignoring the extensive information included in the Gallarelli Affidavit demonstrating the large scale of Pinales' trafficking, Pinales attempts to distinguish Feliz, by emphasizing that in Feliz there was information included in the affidavit of the defendant's drug dealing for 12 years which supported the court's ruling that it was reasonable to suppose that "long time, successful drug trafficker" possessed his home "documents showing the names and telephone numbers of customers and suppliers as well as accounts showing the monies paid and collected." Pinales' attempt to distinguish Feliz from his case fails because the length of time over which a drug dealer traffics cocaine is not the only measure of the scale of a dealer's trafficking activity. The quantity of cocaine trafficked is as good, if not a better measure of the scale of a trafficking organization. In Feliz, the defendant was only capable of selling a kilogram of a time and the court considered that large scale. Similarly, in Ribeiro, the defendant only sold ounce quantities

and would have only a few thousand dollars in proceeds from each sale and yet that was considered a large enough scale to infer that he would keep such cash at his residence. Pinales trafficked cocaine on a far greater scale than the defendants in <u>Feliz</u> and <u>Ribeiro</u> – over two months he received over 100 kilograms of cocaine which his organization actively distributed to its customers. As in <u>Feliz</u>, Pinales was a successful, large scale trafficker, who, it would be reasonable to infer, would keep his cash proceeds, accounting records and client lists at his home. Pinales also argues that the facts here are distinguishable from <u>Feliz</u> because he had a place of business, the Park Avenue Market, from which the Gallarelli Affidavit shows he conducted some of his drug trafficking activity, and thus any nexus between his drug trafficking and his residence is negated. While it is true that the affidavit in <u>Feliz</u> contained no information of another location where Feliz might have stored his cash, accounts and records, the fact that Pinales did have a business location does not automatically negate the reasonable inference that he would store such large sums of cash and such important documents as bank records, financial records, property records, income tax statements, and accountings and records of his drug dealings at his residence. Pinales' residence was certainly a more safe and secure place for such large sums of cash and other sensitive items than a "market" in which at least one other person worked and where there would be noone present during the nighttime. Moreover, from the facts included in the Gallarelli Affidavit and the extent and scale of Pinales' cocaine trafficking and large amount of monetary proceeds generated, Magistrate Bowler's conclusion that there was probable cause to believe evidence of Pinales' cocaine trafficking would be found both at his business and his home, was more than reasonable and supported by a substantial basis.

Additionally, there is evidence in the affidavit from which one could reasonably conclude that members of the organization would deliver money to Pinales at his home. As stated in the

affidavit in ¶53 at page 37, after Pena collected money from a customer, Eduardo told him to pass by "Manuel's" later on, telling him to deliver the money to Manuel. Given the time of the call, 6:55 p.m. and Eduardo's direction to go by "Manuel's," not "the store," a reasonable inference is that Pena was directed to deliver the money to Manuel at his residence.

Furthermore, the facts contained in the affidavit demonstrating the large scale trafficking organization lead by Pinales, the large quantities of cocaine trafficked by Pinales, the large sums of monetary proceeds generated by his criminal activity, and that he maintained accountings and records of such activity, are only buttressed by the information provided by Detective Gallarelli, based upon his training and personal experience,[2] regarding drug traffickers and the evidence that they frequently keep at their residences. Gallarelli Aff. ¶66. Specifically, Detective Gallarelli informed Judge Bowler in his Affidavit that narcotics traffickers maintain books, records, receipts, notes, ledgers, floppy discs, and other records stored in computers, airline tickets, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances, that they commonly "front" (i.e., provide on consignment) drugs to their clients, and that such records are maintained where the traffickers and launderers have ready access to them. Id. at ¶66(b). Similarly, Detectve Gallarelli stated that narcotics traffickers commonly maintain addresses and/or telephone numbers in books or papers which reflect points of contact of their associates in the trafficking and frequently keep such documents within ready access. Id. at ¶66(f). Detective Gallarelli further informed the court that based upon his experience it is common for drug dealers to secrete contraband, proceeds of drug sales

---

[2] As detailed in ¶¶1-6 of the affidavit, Detective Gallarelli's experience as a Boston Police officer and specifically in the area of narcotics, working for 5 years with the Drug Enforcement Administration, is extensive.

and records of drug transactions in secure locations within houses for ready access and to

conceal them from law enforcement authorities, as well as to maintain on hand large amounts of

United States currency in order to maintain and finance their on-going drug business.  Id. at

¶66(c) and 66(a).  Finally, Detective Gallarelli pointed out a significant piece of information –

that when drug traffickers amass large amounts of proceeds from the sale of drugs, the drug

traffickers often attempt to legitimize these profits and to do so, utilize domestic and foreign

banks and/or financial institutions, brokerage houses, real estate, shell corporations, business

fronts, and their attendant services in the transfer of securities, cashier's checks, money drafts,

property titles and letters of credit; such documents are frequently found at the residences of

drug dealers.  Id. at ¶66, 66(d).  The information provided by Detective Gallarelli further

supported and counseled the conclusion reached by Judge Bowler, based upon the facts

regarding Pinales' large scale cocaine included in the affidavit, that there was probable cause to

believe Pinales kept such evidence at his residence.

     In his motion to suppress, Pinales asserts that Detective Gallarelli's statements, based

upon his training and experience, are not corroborated by any facts.  Clearly, Pinales ignores the

substantial evidence presented in the affidavit of Pinales' extensive and large scale cocaine

trafficking of which he maintained records and accounts, which facts support Magistrate Judge

Bowler's finding of probable cause that such evidence would be kept at Pinales' residence.  This

is not a case where Detective Gallarelli's statements based upon his training and experience

stand alone.[3]  Rather, the nexus between the items to be seized and Pinales' residence can be

_____

     [3]  The district court decisions relied upon by the defendant are all distinguishable from
the facts herein because in those cases the affidavit only contained the statements and opinions
of a law enforcement officer to establish probable cause to search a drug dealer's residence.  See
United States v. Rosario, 918 F. Supp. 524 (D.R.I. 1996); United States v. Rios, 881 F. Supp.

reasonably inferred from the facts included in the affidavit demonstrating the "type of crime" to

be large scale cocaine trafficking, the "nature of the items sought" to be cash proceeds and

records of drug trafficking and the location of drug proceeds, the "extent of an opportunity for

concealment" of such evidence, namely cash proceeds, and "normal inferences as to where a

criminal" like Pinales would keep such cash and records.   Feliz, 182 F.3d at 87-88 (quoting

United States v. Charest, 602 F.2d 1015, 1017 (1st Cir. 1979)).

Taking a commonsensical approach to the facts presented in the affidavit, the totality of

circumstances presented in the search warrant clearly show that there was a substantial basis for

concluding that large sums of cash proceeds, records reflecting the location of proceeds derived

from drug trafficking, records and accountings of drug trafficking activities and the other items

enumerated in the search warrant would be found at Pinales' residence.  Accordingly, the Court

should deny Pinales' motion to suppress  the evidence seized during the search of his residence

pursuant to the search warrant.

## II.    EVEN IF FOUND TO BE UNSUPPORTED BY PROBABLE CAUSE, THE SEARCH WARRANT WAS EXECUTED IN GOOD FAITH AND THE GOOD FAITH EXCEPTION UNDER *LEON* WOULD APPLY.

Even if the Court were to find that the Affidavit failed to establish probable cause to

search 193 London Street, Apartment #2, the evidence seized there should not be suppressed

under United States v. Leon, 468 U.S. 897 (1984).  Since no deterrent purpose is served by

---

772 (D. Conn 1995); United States v. Gomez, 652 F. Supp 461 (E.D.N.Y. 1987); United States
v. Kenney, 595 F. Supp. 1453 (D. Me. 1984).  In contrast, the affidavit in support of the warrant
for Pinales' residence included extensive facts showing that Pinales was a large scale trafficker
of cocaine and supporting a finding of probable cause that evidence of his trafficking activity
would be kept at his residence.  Additionally, in each of these cases, except Kenney,  in which
the courts held the warrants insufficient because of lack of probable cause, the courts refused to
suppress the evidence found, holding that the "good faith exception" of United States v. Leon
applied.

sanctioning "objectively reasonable" law enforcement conduct, the "extreme sanction" of exclusion is inapplicable to evidence seized pursuant to a search warrant obtained in an "objectively reasonable" manner from a neutral magistrate, even assuming the warrant or supporting affidavits were defective. Leon, 468 U.S. at 922, 926; Zayas-Diaz, 95 F.3d at 113; United States v. Ricciardelli, 998 F.2d 8, 15 (1st Cir. 1993). With the issuance of a search warrant, "exclusionary rule" deterrence is appropriate in certain, limited circumstances where: "(1) the magistrate is 'misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth'; (2) the magistrate 'wholly abandon[s] his [detached and neutral] judicial role'; (3) the warrant is 'so facially deficient [e.g., failing to list, with sufficient particularity, the evidence to be seized] ... that the executing officers cannot reasonably presume it to be valid'; or (4) the supporting affidavits is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.' " Zayas-Diaz, 95 F.3d at 113 (quoting Leon, 468 U.S. at 923). None of these circumstances are presented in this case.

    The Gallarelli Affidavit and the search warrant are within the bounds of the Leon good faith exception. Nothing in the Affidavit or in the record suggests that the Judge Bowler was misled by information contained in the affidavit that the affiant either knew was false or should have known was false. Cf. United States v. Vigeant, 176 F.3d 565, 572 (1st Cir. 1999)(good faith exception inapplicable because of material omissions and false and misleading statements contained in affidavit); Ricciardelli, 998 F.2d at 16 (officers' failure to disclose fact that package might not even be delivered to premises in affidavit for anticipatory search warrant led to subsequent invalidation of the warrant). Likewise, contrary to Pinales' baseless assertions, there is no evidence to suggest that Judge Bowler "wholly abandoned" her judicial role as a neutral

and detached magistrate when she signed and authorized the search warrant application.  <u>Leon</u>, 468 U.S. at 923.

Finally, it cannot be said that the Affidavit was either "so lacking in indicia of probable cause" or "so facially deficient i.e. in failing to particularize the place to be searched or the things to be seized," that even the affiant should have realized that probable cause was a reach or that the warrant was patently invalid.  <u>Leon</u>, 468 U.S. at 923.  On the contrary, the Gallarelli Affidavit was prepared and presented in a thorough and detailed manner.  It contained inculpatory evidence developed from an ongoing law enforcement investigation involving evidence from numerous sources including but not limited to interceptions of wire communications over numerous telephones including phones used by Pinales, and surveillance. The affidavit did not include mere conclusory statements, but a detailed summary of an ongoing law enforcement investigation that permitted Judge Bowler to find probable cause to search Pinales' residence at 1828 River Street, Hyde Park, MA.  Assuming *arguendo*, however, that the Court finds that probable cause was lacking to search Pinales' residence, the government contends that the good faith exception under <u>Leon</u> justifies preservation of any evidence seized. A well-trained law enforcement officer reasonably could have relied upon the Gallarelli Affidavit as adequate support for the issuing magistrate's finding that there was a fair probability that the enumerated items would be located at 1828 River Street, Hyde Park.  <u>Zayas-Diaz</u>, 95 F.3d at 116.  Accordingly, the Court should deny Pinales' motion to suppress.

## CONCLUSION

For the foregoing reasons, the government respectfully requests  the Court to deny Pinales' Motion to Suppress evidence seized from his residence pursuant to a search warrant  on the pleadings and without an evidentiary hearing.  <u>See</u> <u>United States v. Lewis</u>, 40 F.3d 1325,

1332 (1ˢᵗ Cir. 1994)(affirming district court's refusal to hold an evidentiary hearing where the

factual matters were essentially uncontested).

<div style="margin-left: 40%;">

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:    /s/ Maureen B. Hogan
       MAUREEN B. HOGAN
       Assistant United States Attorney

</div>

<u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served the foregoing document (with attachments)

upon counsel of record by depositing in the United States mail a copy of same in an envelope

bearing sufficient postage for delivery.

This 7ᵗʰ day of November 2005.

<div style="margin-left: 40%;">

/s/ Maureen B. Hogan
MAUREEN B. HOGAN
Assistant United States Attorney

</div>